[No. C029712. Third Dist. June 16, 1999.]

CALIFORNIA CORRECTIONAL PEACE OFFICERS ASSOCIATION,
Plaintiff and Appellant, v.
DEPARTMENT OF CORRECTIONS, Defendant and Respondent.

**COUNSEL**

Joel H. Levinson for Plaintiff and Appellant.

Marguerite D. Shea, K. William Curtis and Kenneth R. Hulse for Defendant and Respondent.

**OPINION**

**BLEASE, J.**—This is an appeal from a summary judgment in an action seeking a declaration that James Blanchard, a correctional officer, is not prohibited from possessing a firearm under Penal Code section 12021.[1] Blanchard, a correctional officer for 15 years, will lose his employment as a peace officer if he cannot possess a firearm.

Section 12021, subdivision (a), declares it a felony to own or possess a firearm if convicted of a felony or of specified misdemeanors, including, by

---

[1] A reference to a section is to the Penal Code unless otherwise stated.

reference to section 12001.6, subdivision (b), section 246. Blanchard was convicted 20 years ago of a misdemeanor violation of section 246. It was on this ground the trial court denied relief.

Plaintiff California Correctional Police Officers Association (CCPOA), Blanchard's union, appeals contending a later amendment to subdivision (c) of section 12021 explicitly restricts the ownership or possession of a firearm to a 10-year period following a misdemeanor conviction of section 246, under which Blanchard qualifies. We agree.

We resolve the irrefragable conflict between subdivisions (a) and (c) of section 12021 under the rule the most recently enacted language controls, by giving effect to the later amendment of subdivision (c). We will modify the judgment to declare that Blanchard's conviction is subject to the 10-year firearm possession ban provision of section 12021, subdivision (c).

### Facts and Procedural Background

The matter was resolved by a summary judgment on the following pertinent[2] stipulated facts.

Blanchard has been a correctional officer for 15 years. In September 1978 he suffered a misdemeanor conviction of discharging a firearm at an inhabited dwelling under section 246, apparently arising out a domestic dispute (see fn. 2, *post*). In October 1997, he was temporarily reassigned to non-peace-officer duties, pursuant to a review by the Department of Corrections of employees potentially subject to a firearms prohibition under the recent amendment of the federal firearms statute.

The trial court ruled that Blanchard was subject to a permanent ban against possession of a firearm under section 12021, subdivision (a). It reasoned that "[a]lthough Penal Code § 246 is also one of the offenses enumerated in Penal Code § 12021(c)(1), which imposes a ten year firearms

---

[2]The CCPOA action was framed to address questions concerning a ban on the possession of firearms by persons convicted of "a misdemeanor crime of domestic violence" imposed by an amendment to a federal statute, 18 United States Code section 922(g)(9). The principal issue in the CCPOA suit concerned the applicability of an exception in the federal law for expunged convictions. (18 U.S.C. § 921(a)(33)(B)(ii).) It provides, in pertinent part: "(ii) A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged . . . unless the . . . expungement . . . expressly provides that the person may not . . . possess . . . firearms." CCPOA contended the 10-year prohibition for firearms possession in section 12021.5, subdivision (b), operated to lift the federal ban after an expungement and lapse of that period. CCPOA prevailed on that point in the trial court and no appeal is taken nor any issue raised as to that component of the judgment. Accordingly, we have no occasion to address the federal statute.

ban, subsection (c), expressly excludes offenses enumerated in subsection (a) from its provisions. The Court finds that a conviction under Penal Code § 246 remains subject to a permanent firearms ban under State law . . . ."

CCPOA appeals from this portion of the judgment.

DISCUSSION

We begin by repeating a caveat from a recent apposite opinion.

"This case concerns itself solely with the construction of Penal Code sections 12021 and 12021.1. At first blush, the statutes seem impenetrable. Reading them is hard, writing about them arduous, reading about them probably downright painful. The similarity of the section numbers and the fact each section has a particular subdivision which requires discussion in conjunction with other similarly denominated subdivisions makes for tough sledding. As Alfred North Whitehead wrote of rationalism, the effort is, itself, 'an adventure in the clarification of thought.' (Whitehead, Process and Reality (1929) pt. I, ch. I, § 3.) The reader who is not inclined to such adventure and who is fortunate enough not to confront these statutes is probably well advised to forego this opinion." (*Rash* v. *Lungren* (1997) 59 Cal.App.4th 1233, 1235 [69 Cal.Rptr.2d 700].)

The question is the proper construction of section 12021. The problem arises because an amendment to section 12021, subdivision (c) in 1994 added section 246 to the list of misdemeanor convictions subject to its 10-year ban. (Stats. 1994, First Ex. Sess. 1994, ch. 33, § 3.5, eff. Nov. 30, 1994.)[3]

We commence with the text. (See, e.g., *Nunez* v. *Superior Court* (1983) 143 Cal.App.3d 476, 480 [191 Cal.Rptr. 893].) In this case, we look to the text of section 12021 as it stood immediately after the enactment of the pertinent 1994 amendment, with amendment additions in italics and section 246 in bold:

"(a)(1) Any person who has been convicted of a felony under the laws of the United States, of the State of California, or any other state, government,

---

[3]The amendment adding misdemeanor violations of section 246 to section 12021, subdivision (c), was enacted subsequent to sections 12001.6, 12021, subdivision (a), and 12021.1, subdivisions (a) and (b)(26), which jointly were enacted in 1982 (Stats. 1982, ch. 136, §§ 5, 6 & 7, pp. 445-447) and subsequent to the amendment by which section 12021.1, subdivision (b)(26) became subdivision (b)(27) (Stats. 1993, ch. 612, § 9, eff. Sept. 30, 1993, operative Jan. 1, 1994).

or country, or of an offense enumerated in subdivision (a), (b), or (d) of Section 12001.6,[4] or who is addicted to the use of any narcotic drug, who owns or has in his or her possession or under his or her custody or control any firearm is guilty of a felony.

"...............................

"(c)(1) Except as provided in subdivision (a) or paragraph (2) of this subdivision, any person who has been convicted of a misdemeanor violation of Section *71, 76,* 136.5, *or* 140, *subdivision (d) of Section 148, Section* 171b, 171c, 171d, *186.28,* 240, 241, 242, 243, 244.5, 245, 245.5, **246**, 246.3, 247, 273.5, 273.6, 417, *417.1,* 417.2, *417.6,* 626.9, 646.9, *or 12023,* subdivision (b) or (d) of Section 12034, *Section 12040, subdivision (b) of Section 12072,* subdivision (a) of *former* Section 12100, *Section* 12320 or 12590, *or Section 8101 of the Welfare and Institutions Code, any firearm-related offense pursuant to Sections 871.5 and 1001.5 of the Welfare and Institutions Code, or of the conduct punished in paragraph (3) of subdivision (g) of Section 12072,* and who, within 10 years of the conviction, owns, or has in his or her possession or under his or her custody or control, any firearm is guilty of a public offense, which shall be punishable by imprisonment in the state prison or in a county jail not exceeding one year, by a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine."

Alas, as to the offense in this case, unlike the offense in *Rash* v. *Lungren, supra,* 59 Cal.App.4th 1233,[5] the text of subdivision (a) of section 12021 as well as section 12021.1, subdivisions (a) and (b)(27)[6] cannot be harmonized with the subsequently enacted text of subdivision (c) of section 12021: There is an irrefragable conflict. The misdemeanor offense denominated by section 246 is explicitly within the texts of both the newly added text of section

[4]Section 12001.6, in pertinent part, is as follows.
"As used in this chapter, an offense which involves the violent use of a firearm includes any of the following:
"...............................
"(b) A violation of Section 246."
[5]In *Rash* v. *Lungren, supra,* 59 Cal.App.4th at pages 1235-1236, the plaintiff, Rash, was convicted of a misdemeanor violation of section 245, subdivision (a)(2), assault with a firearm. He claimed the offense came within the 10-year washout provision of section 12021, subdivision (c), which referred only to section 245 without specification of its subdivisions. Like this case, the offense was enumerated in section 12001.6, subdivision (a), and thus within the unlimited prohibition of section 12021, subdivision (a)(1). Rash argued there was a conflict between subdivision (a)(1) (as well as section 12021.1, subdivisions (a) and (b)(27)) and subdivision (c). However, *Rash* found no conflict because some misdemeanor violations of section 245 specified in its subdivisions are not within subdivision (a), and those alone (i.e., "[e]xcept as provided in subdivision (a)") are within subdivision (c).
[6]Section 12021.1, in pertinent part, is as follows.

12021, subdivision (c) and subdivision (a) (by virtue of its reference to section 12001.6, subdivision (b)). There is no way to give effect to all the words of section 12021; either "[subdivision] (b) [of Section 12001.6]" must be stricken from subdivision (a) of section 12021 or "[Section] 246" must be stricken from subdivision (c). The same conflict exists between subdivision (c) of section 12021 and section 12021.1, subdivisions (a) and (b)(27).

■ CCPOA, citing *People* v. *Bustamante* (1997) 57 Cal.App.4th 693, 701 [67 Cal.Rptr.2d 295], argues that this semantic discord should be resolved under the rule that where two laws on the same subject, passed at different times, are inconsistent with each other, the later act prevails. We agree that this rule governs the conflict between section 12021 and section 12021.1. ■ But since the question as to the meaning of the language of section 12021 concerns the effect of inconsistent portions of an amended statute, *Donlon* v. *Jewett* (1891) 88 Cal. 530, 535 [26 P. 370], is more apposite: "If, however, it is found that there is an irreconcilable conflict between the amendment and some portion of the old statute that has been preserved and republished in the revision, so that no effect can be given to one without destroying the operation of the other, and there is nothing else to indicate the probable intention of the legislature, it might be necessary to hold that full effect is to be given to the amendment and the re-enactment of the conflicting portions of the original act treated as a mistake." (See also *People* v. *Saffell* (1946) 74 Cal.App.2d Supp. 967 [168 P.2d 497]; 1A Sutherland, Statutory Construction (5th ed. 1993) §§ 23.12, p. 363, 22.34, p. 297.)

■ The state argues the two subdivisions of section 12021 are only "superficially inconsistent." Our dissenting colleague takes the same tack, urging that the conflict can be resolved by treating the introductory phrase "Except as provided in subdivision (a) . . ." (§ 12021, subd. (c)(1)) as a legislative direction to resolve the conflict by giving effect to the text of subdivision (a) and by making the newly added text of subdivision (c) disappear as "surplusage." This requires attribution of a senseless act to the Legislature.

The language "[e]xcept as provided in subdivision (a) . . ." has an evident and sensible purpose, to govern partial overlap, e.g., to ensure that in a case where a person convicted of a misdemeanor listed in subdivision (c)

---

"(a) Notwithstanding subdivision (a) of Section 12021, any person who has been previously convicted of any of the offenses listed in subdivision (b) and who owns or has in his or her possession or under his or her custody or control any firearm is guilty of a felony. . . .

". . . [¶] . . . [¶] (27) Any offense enumerated in subdivision (a), (b), or (d) of Section 12001.6."

of section 12021 also stands convicted of a felony or is addicted to the use of a narcotic drug, the misdemeanor conviction does not result in the lifting of the prohibition that would otherwise apply under subdivision (a). This purpose to harmonize the application of the two subdivisions in situations of partial overlap fully accounts for the phrase. The suggestion the phrase was also meant to excise entirely language added to subdivision (c) requires the belief the Legislature intentionally engages in semantic horseplay, that the Legislature would, at the moment of enactment, excise that which it had just enacted.[7]

The dissent characterizes the effect of this artificial usage of "[e]xcept as provided in subdivision (a) . . ." as honoring a plain reading of the statute. There is nothing plain about a meaning that has the speaker engaging in double talk; one does not honor speech by giving it a senseless construction.

Nor is it sensible to say this verbal maneuver avoids a conflict between the language of the two subdivisions of section 12021. ██ ██ Calling the words added in subdivision (c) "surplusage"[8] does not avoid a conflict, it resolves it by choosing to give effect to the words of one of the conflicting branches of the semantic dilemma. The problem presented by the conflict; in the language of section 12021 and section 12021.1 cannot be papered over by semantic contortions.

The state submits that giving this peculiar effect to the introductory proviso to section 12021, subdivision (c), "[e]xcept as provided by subdivision (a) . . ." harmonizes the statute. However, giving such effect to the exception would nullify the explicit addition of section 246 to section 12021, subdivision (c). Harmony gives a role to both voices; silencing one is not harmony, it is suppression.

The state argues that repealing the inclusion of section 246 in section 12021, subdivision (c) is good policy, because it sensibly groups that offense with others for which the more stringent sanction under section 12021, subdivision (a) is applied. However, the obverse is also true; section 12021,

---

[7]This is a species of linguistic nonsense, involving a classic problem of self-reference, an enduring source of paradox; thus, the Epimenides paradox, the statement "All Cretans are liars" said by a Cretan. (See generally, Hofstadter (1979) Godel, Escher, Bach: an Eternal Golden Braid; and note Russell's paradox, the class of all classes is a member of itself only if it isn't (*id.* at pp. 21-22).

[8]"Surplusage" in a legal instrument is matter that is unnecessary to the meaning of the instrument and which therefore may be ignored or rejected. (See, e.g., Black's Law Dict. (6th ed. 1990) p. 1443.) The inclusion of section 246 in subdivision (c) of section 12021 is anything but surplusage.

subdivision (c) also appears to sensibly group section 246 with other similar misdemeanor offenses. However, we have no occasion to carefully examine the proffered logical grouping. This is not a case of statutory ambiguity, which we may resolve by selection of one candidate application from among several semantically permissible applications based upon the probable public policy of the Legislature. In this case, two conflicting statements of public policy have been uttered by the Legislature. Our role is to ascertain which is superior and which must give way.

The dissent argues, in effect, that we should examine the legislative history of the several enactments to determine whether the Legislature intended an implied repeal of the permanent firearm ban under section 12021, subdivision (a) and section 12021.1. The underlying premise proceeds from the unfortunate terminology of "implied repeal." It suggests there is a judicial power actually to repeal a statute. That is not the case. ▮ "Repeal" applies "only to acts which effect change in the legal system primarily by the mode of *overtly and explicitly* abrogating provisions of prior statute law." (1A Sutherland, Statutory Construction, *supra,* § 23.01, p. 320, italics added; hereafter Sutherland.) Hence, "implied repeal" is, strictly speaking, an oxymoron, since it arises out of legislative ignorance of the provision of the prior statute law that is abrogated. The fictive mind of the Legislature cannot intend to abrogate a statutory provision of which it is unaware.

This presents a puzzle. If legislative intent is primary in the interpretation of statutes, how do we get unintended implied repeals? We recently addressed a related problem concerning "implied amendment."

▮ "Failing an amendment, the state seeks refuge in the doctrine of amendment by implication. The purpose of the doctrine is to resolve conflicts in enactments of equal legal status, not to provide another means of 'amendment.' It expresses the rule that a later enactment may prevail over an earlier, conflicting enactment of the same legal status in respects the conflict. The rule does not apply where the later enactment is legally subordinate to the earlier enactment, that is, where a conflict is ruled out by the superior legal status of the earlier enactment." (*American Lung Assn.* v. *Wilson* (1996) 51 Cal.App.4th 743, 752 [59 Cal.Rptr.2d 428] (conc. opn. of Blease, Acting P. J., with Scotland, J. conc. therein).)

▮ "Implied repeal" is not another means by which to repeal a statute. Like "implied amendment," "implied repeal" is a term employed in the resolution of conflicts in enactments of equal legal status. (See Sutherland, *supra,* § 23.09, p. 337.) The "presumption" against implied repeals enjoins us to reconcile apparent contradictions if that is reasonably possible.

■ The only role for discerning legislative intent lies in ascertaining the respective meanings of the earlier and later enactments to determine if those meanings present an unavoidable conflict that requires, in enforcing the most recent expression of legislative will, the suppression of the older expression of legislative will.[9] The dissent has it backwards in asserting its approach is constitutionally compelled. The rule that the later enactment prevails is an aspect of judicial deference to legislative supremacy.

The reason for judicial restraint is that the cure is worse than the disease. Ignoring the most recent enactment or curing a perceived omission or inclusion beyond the bounds permitted by interpretation, a judicial temptation of the first order, encroaches on the legislative power. If the Legislature has made a mistake, it has the (legislative) means to correct the mistake. And it does. As anyone familiar with the legislative process knows, the Legislature routinely passes legislation to clean up past mistakes. That is the legislative function. It should not be transferred to the judicial branch, which lacks that power.

The amendment of section 12021 providing that a misdemeanor conviction under section 246 warrants the less stringent prohibition under subdivision (c) of section 12021 is the most recent expression of the Legislature. Under the authorities previously cited, the most recent expression prevails. The inclusion of section 246 in subdivision (c) of section 12021 must be given effect, in the only way that it can be given effect, by reading it as superior to the entirely inconsistent inclusion of subdivision (b) of section 12001.6 in subdivision (a) of section 12021 and in section 12021.1, subdivision (b)(27).

### DISPOSITION

Subdivision (1) of the judgment is stricken. Subdivision (2) of the judgment is modified to add the following at the end of the present text: "The same is true as to Officer Blanchard. His expunged misdemeanor conviction in 1978 under Penal Code Section 246 also falls within the provisions of § 12021, subdivision (c)(1)." As modified, the judgment is affirmed. CCPOA shall recover its costs of this appeal.

Scotland, P. J., concurred.

---

[9]The following passage in Sutherland illustrates the limited usage of intent in this context. "[I]n the process of construing a statute the intent of the legislature is always of prime importance. Where there is an ambiguity in the statute, the legislative intent is the source of the compromise, but where a conflict is readily seen by an application of the later enactment in accord with that intent, it is clear that the later enactment is intended to supersede the existing law. The language used by the courts will usually stress the conflict rather than the legislative intent." (Sutherland, *supra*, § 23.09, p. 338.)

**KOLKEY, J.**—I respectfully dissent. The majority's construction of Penal Code section 12021[1] oversteps our constitutional role to construe statutes as they are, and not rewrite them as we speculate they might be. Despite rules of statutory construction against repeals by implication, and a specific legislative directive to honor the permanent firearm ban in the event of a statutory conflict, the majority today disregards that directive and judicially repeals the permanent ban on firearm possession imposed by two separate statutes on those convicted of violating section 246—which makes it a crime to maliciously discharge a firearm at an occupied home, vehicle, or aircraft.

The majority argues that it must nullify (that is, judicially repeal) the statutory language imposing this permanent firearm ban on the ground that an "irrefragable conflict" (maj. opn., *ante*, at p. 1334) exists between the permanent firearm ban for violations of section 246 under subdivision (a) of section 12021 and the 10-year firearm ban for misdemeanor violations of section 246 under subdivision (c)(1) of the same statute.[2]

However, no conflict exists because subdivision (c)(1) is prefaced with the phrase, "[e]xcept as provided in subdivision (a)"—thus directing that subdivision (a)'s permanent firearm ban be honored in the event of a conflict between the two subdivisions. Wrapping itself in the banner of judicial restraint, the majority argues that "[t]he rule that the later enactment prevails is an aspect of judicial deference to legislative supremacy" (maj. opn., *ante*, at p. 1340), but that rule requires an "irreconcilable conflict" between the new and old provisions before it can be invoked. (E.g., *Estate of Steehler* (1925) 195 Cal. 386, 399 [233 P. 972]; *Woodard v. Southern Cal. Permanente Medical Group* (1985) 171 Cal.App.3d 656, 664 [217 Cal.Rptr. 514]; 2B Sutherland, Statutory Construction (5th ed. 1992) § 51.02, pp. 121-122.) Indeed, the rule so implicates the power of the Legislature (by nullifying its earlier enactments) that a long line of authority holds that it is to be countenanced only as "a matter of necessity." (See Hamilton, The Federalist Papers, No. 78 (New Amer. Lib. 1961) p. 468; see also *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 249 [279 Cal.Rptr. 325, 806 P.2d 1360] [The law " 'shuns repeals by implication . . . .' "].) And judicial repeal of the permanent firearm ban for those convicted of violating section 246 is clearly not a matter of necessity when the Legislature has directed that the permanent ban is to govern in the event of a conflict. In other words, the Legislature has resolved the conflict, and with its resolution, the foundation for the majority's decision—an "irrefragable conflict"—collapses.

---

[1] Unless indicated otherwise, all statutory references are to the Penal Code.

[2] All references to subdivision (c)(1) are to subdivision (c)(1) of section 12021. All references to subdivision (a) are also to section 12021, unless otherwise indicated.

Indeed, the majority treats section 12021 as if there were no legislative directive giving subdivision (a) precedence in the event of a conflict. Admittedly, were there no such directive, there would, in fact, be an irreconcilable conflict between the two subdivisions, and a court would have no way of knowing the Legislature's intent as to which one should control. In such a case, the courts remain faithful to their role as the interpreter, not the author, of the laws when they give effect to the "later expression of the [L]egislature" over the earlier one. (2B Sutherland, *supra*, § 51.02 at p. 122, fn. omitted.) But, as will be explained shortly, that is precisely why the rule that the later enactment controls is always phrased in terms of, and can only be invoked by, "an irreconcilable conflict" between the later and earlier enactments. (E.g., *Estate of Steehler, supra*, 195 Cal. at p. 399.) Only then may the courts, consistent with their constitutional role, choose one legislative act over another.

Here, however, the court need not act out of necessity: It is not faced with the dilemma over whether to choose the permanent firearm ban under subdivision (a) or the 10-year ban under subdivision (c)(1), because the Legislature has directed that subdivision (c)(1) applies "[e]xcept as provided in subdivision (a)." If the court nonetheless ignores the directive and instead gives effect to the 10-year ban, the court makes a policy judgment. Most revealing is the majority opinion's admission that "[i]n this case, two conflicting statements of public policy have been uttered by the Legislature. Our role is to ascertain which is superior and which must give way." (Maj. opn., *ante*, at p. 1339.) That most emphatically is *not* the court's role.

In short, the majority's construction of section 12021 decidedly trespasses on the province of the Legislature. To give effect, as the majority does, to the reference to section 246 in subdivision (c)(1), the majority must judicially repeal the permanent firearm ban for violations of section 246 specified under two separate statutes (sections 12021 and 12021.1); it must ignore the statutory directive to give precedence to the permanent firearm ban in the event of a conflict with the 10-year ban; and it must ignore the legislative history that confirmed the permanent firearm ban for violations of section 246 during the very same legislative session that dumped section 246 (and numerous other sections) into the litany of misdemeanor violations subject to the 10-year ban (albeit subject to the exception that the permanent ban under subdivision (a) must always control). (As explained later, the majority opinion's "solution" to rewrite the legislative directive to impose the permanent firearm ban only for those convicted of a felony or those addicted to the use of narcotics simply compounds the encroachment on the Legislature's powers by reading out whole sections of the statute without any basis or authority.)

In contrast, the alternative statutory construction here—giving a plain reading to the two relevant statutes—honors the language in subdivision (c)(1) to give precedence to subdivision (a) in the event of a conflict; does not require a judicial repeal of the permanent firearm ban for violations of section 246; adheres to the canon of statutory construction against implied repeals; and is consistent with the legislative history.

Although surplusage results from this interpretation—a small price to pay in order to avoid judicial repeal—courts are only required to give effect to all provisions of a statute "if possible." (Code Civ. Proc., § 1858.) And it is clearly not possible when giving effect to the surplusage requires that we not give effect to another phrase, "[e]xcept as provided in subdivision (a)," *and* judicially repeal portions of two statutes.

Unless the legislative history clearly demonstrates to the contrary, where two alternatives for construing a statute exist—one which speculates that a later enactment impliedly repeals older statutory provisions in the face of a legislative directive to the contrary, and the other which construes the statute in accordance with its plain language, which leaves surplusage—the courts overstep their constitutional role when they choose judicial repeal over legislative redundancy. Faced with those alternatives, we should construe the statute as it reads and leave it to the Legislature to rewrite the statute if it disagrees.

As shown herein, I dissent from a judicial repeal of the permanent firearm ban for violations of section 246 because it fails to honor a plain reading of the statute, misapplies the canons of statutory construction, ignores the legislative history, and trespasses on the province of the Legislature.

I. *A Plain Reading of Sections 12021 and 12021.1 Supports a Permanent Ban for Violations of Section 246*

The most powerful safeguard for the courts' adherence to their constitutional role of construing, rather than writing, statutes is to rely on the plain language of the statute. (See *Seaboard Acceptance Corp.* v. *Shay* (1931) 214 Cal. 361, 365 [5 P.2d 882] ["This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed. This court is limited to interpreting the statute, and such interpretation must be based on the language used."].) Such a rule prevents judges from speculating as to what was in the minds of the majority of legislators when they enacted a particular bill and instead directs the courts to rely on the statute's language for purposes of ascertaining the Legislature's intent. Thus, the California Supreme Court has long directed the courts to ascertain legislative intent by first examining the language of the statute.

As stated in *People v. Cruz* (1996) 13 Cal.4th 764, 774-775 [55 Cal.Rptr.2d 117, 919 P.2d 731] (*Cruz*): "The fundamental task of statutory construction is to 'ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute.' [Citation.]" " '[T]he statutory language, of course, is the best indicator of legislative intent.' " (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 350 [19 Cal.Rptr.2d 882, 852 P.2d 377], quoting *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 826 [4 Cal.Rptr.2d 615, 823 P.2d 1216].) Indeed, the courts " ' "must follow the language used and give to it its plain meaning, whatever may be thought of the wisdom, expediency, or policy of the act, even if it appears probable that a different object was in the mind of the legislature." ' " (*People v. Weidert* (1985) 39 Cal.3d 836, 843 [218 Cal.Rptr. 57, 705 P.2d 380], quoting *Woodmansee v. Lowery* (1959) 167 Cal.App.2d 645, 652 [334 P.2d 991].)

A plain reading of both sections 12021 and 12021.1 establishes unambiguously that those convicted of a violation of section 246 are subject to a permanent firearm ban.

A. *Section 12021*

Subdivision (a)(1) provides that any person "who has been convicted of a felony under the laws of the United States, of the State of California, or any other state, government, or country, *or of an offense enumerated in subdivision (a), (b), or (d) of section 12001.6,* or who is addicted to the use of any narcotic drug, who owns or has in his or her possession or under his or her custody or control any firearm is guilty of a felony." (Italics added.) In turn, subdivision (b) of section 12001.6—which enumerates offenses that involve "the violent use of a firearm"—specifies section 246 as one such offense.[3] Accordingly, section 12021, subdivision (a) unambiguously provides that anyone convicted of a *felony or of specified offenses for the violent use of a firearm* (which includes section 246)—whether a felony *or* misdemeanor—is permanently banned from owning, possessing or controlling a firearm.

Subdivision (c)(1) does not alter subdivision (a). Instead, it provides that in the event of a conflict, subdivision (a) prevails: *"Except as provided in subdivision (a)* . . . any person who has been convicted of a misdemeanor violation of Section 71 . . . [or] Section . . . 246 . . . and who, within 10

---

[3]Section 12001.6 provides in full as follows: "As used in this chapter, an offense which involves the violent use of a firearm includes any of the following: [¶] (a) A violation of paragraph (2) or (3) of subdivision (a) of Section 245 or a violation of subdivision (c) of Section 245. [¶] (b) A violation of Section 246. [¶] (c) A violation of paragraph 2 of subdivision (a) of Section 417. [¶] (d) A violation of subdivision (c) of Section 417."

years of the conviction, owns, or has in his or her possession or under his or her custody or control, any firearm is guilty of a public offense . . . ."[4] (Italics added.)

In *Rash v. Lungren* (1997) 59 Cal.App.4th 1233 [69 Cal.Rptr.2d 700], the Court of Appeal construed the same statute but in the context of a misdemeanor conviction under section *245,* subdivision (a)(2)—which is also covered by the permanent firearm ban under subdivision (a). Although misdemeanor violations of section 245 are also enumerated under the 10-year ban under subdivision (c)(1), the Court of Appeal held that there was no conflict between subdivisions (c)(1) and (a): "There is no conflict. By making its 10-year prohibition applicable to all persons who have suffered misdemeanor convictions under section 245 except as provided in subdivision (a) . . . , subdivision (c)(1) defines both the class of persons subject to the 10-year rule and the class of those who are not. . . . [¶] The language of section 12021 requires no construction. Read as a whole and in context, it unmistakably excludes persons who have been convicted of violating section 245, subdivision (a)(2) from the category of individuals who can avoid the permanent firearm ban. Although [petitioner] was convicted of a misdemeanor violation of section 245, his conviction for assault with a firearm under section 245, subdivision (a)(2) comes within the specific exception set out in the introductory phrase of section 12021, subdivision (c)(1)." (*Rash v. Lungren, supra,* 59 Cal.App.4th at pp. 1238-1239, italics and fns. omitted.)

Admittedly, *Rash* is distinguishable because honoring the permanent firearm ban for violations of section 245, subdivision (a)(2) does not make the reference to section 245 in subdivision (c)(1) surplusage. In contrast, in this case, giving effect to the clause, "[e]xcept as provided in subdivision (a)"—which imposes a permanent firearm ban for any violations of section 246—makes the inclusion of section 246 in subdivision (c)(1) surplusage. However, this distinction does not alter *Rash*'s ruling that subdivision (a) is not in conflict with subdivision (c)(1) because a plain reading of the statute requires that subdivision (a) be given precedence over subdivision (c)(1).

---

[4]Subdivision (c)(1) provides more fully as follows: "Except as provided in subdivision (a) . . . any person who has been convicted of a misdemeanor violation of Section 71, 76, 136.5, or 140, subdivision (d) of Section 148, Section 171b, 171c, 171d, 186.28, 240, 241, 242, 243, 244.5, 245, 245.5, 246, 246.3, 247, 273.5, 273.6, 417, 417.1, 417.2, 417.6, 626.9, 646.9, 12023, or 12024, subdivision (b) or (d) of Section 12034, Section 12040, subdivision (b) of Section 12072, subdivision (a) of former Section 12100, Section 12220, 12320, or 12590, or Section 8100, 8101, or 8103 of the Welfare and Institutions Code, any firearm-related offense pursuant to Sections 871.5 and 1001.5 of the Welfare and Institutions Code, or of the conduct punished in paragraph (3) of subdivision (g) of Section 12072, and who, within 10 years of the conviction, owns, or has in his or her possession or under his or her custody or control, any firearm is guilty of a public offense . . . ."

Moreover, if the statute is read to give effect to the reference to section 246 in subdivision (c)(1), effect cannot be given to the phrase, "[e]xcept as provided in subdivision (a)," set forth in the introductory clause to subdivision (c)(1), *and* subdivision (a) must be rewritten to eliminate the permanent firearm ban for violations of section 246. Such an approach speculates over the Legislature's intent in adding section 246 to subdivision (c)(1): It rewrites subdivision (a) on the assumption that the Legislature did not mean to retain a permanent firearm ban for violations of section 246, despite statutory language that gives precedence to the permanent ban in the event of a conflict. As shown in part II, the rule of statutory construction used to clothe this speculation (the rule that the later legislative act prevails over the earlier) does not apply because there is no irreconcilable conflict that triggers the rule.

The majority argues that "[t]he language '[e]xcept as provided in subdivision (a) . . .' has an evident and sensible purpose, to govern partial overlap, e.g., to ensure that in a case where a person convicted of a misdemeanor listed in subdivision (c) also stands convicted of a felony or is addicted to the use of a narcotic drug, the misdemeanor conviction does not result in the lifting of the prohibition that would otherwise apply under subdivision (a)." (Maj. opn., *ante*, at pp. 1337-1338.) But this argument rewrites the language of the phrase "[e]xcept as provided in subdivision (a)" to "except as provided in the first and third phrases in subdivision (a)." The argument is also circular: Subdivision (a) imposes a permanent firearm ban on any person who has been convicted "of a felony under the laws of the United States, of the State of California, or any other state, government, or country," *or* "of an offense enumerated in subdivision (a), (b), or (d) of section 12001.6," *or* "who is addicted to the use of any narcotic drug." By interpreting the legislative directive, "[e]xcept as provided in subdivision (a)," not to include subdivision (a)'s permanent ban for those convicted "of an offense enumerated in subdivision (a), (b), or (d) of section 12001.6," the majority simply assumes away that which it seeks to conclude. It is a wholly insupportable interpretation that ignores the language of the statute and is not instructed by the legislative history.

The majority also argues that honoring the plain meaning of the phrase, "[e]xcept as provided in subdivision (a)," is "double talk." (Maj. opn., *ante*, at p. 1338.) It claims that "one does not honor speech by giving it a senseless construction." (*Ibid.*) But there is nothing senseless about giving effect to an unequivocal statutory directive which provides that in the event of a conflict, subdivision (a) controls. And a plain reading of subdivisions (a) and (c)(1) shows that the Legislature expected conflicts to arise on occasion between

subdivision (a) and subdivision (c)(1)—even before section 246 was amended into subdivision (c)(1): Since the 10-year ban under subdivision (c)(1) covered specified misdemeanors and the permanent firearm ban under subdivision (a) covered all felony convictions as well as convictions for offenses under subdivisions (a), (b), or (d) of section 12001.6—whether felony or misdemeanor—it necessarily recognized that there would be misdemeanor violations which qualified for both the permanent ban under subdivision (a) and the 10-year ban under subdivision (c)(1) and directed that the permanent ban control in the event of a conflict.

Narrowly focused, however, on the prospect that a plain reading of the statute will not give effect to the addition of section 246 to subdivision (c)(1), making it surplusage, the majority argues that "[c]alling the words added in subdivision (c) 'surplusage'[] does not avoid a conflict, it resolves it by choosing to give effect to the words of one of the conflicting branches of the semantic dilemma." (Maj. opn., *ante*, at p. 1338, fn. omitted.)

To the contrary, it is the *Legislature* that chose to give effect to one of the conflicting subdivisions. For that reason, the majority opinion cannot legitimately claim that its approach is one of judicial restraint. By ignoring the legislative directive (or rewriting it in a way wholly unsupported by any statutory language), the majority has grasped the mantle of policy away from the Legislature and decided to legislate a reduction of the firearm ban for those convicted of discharging firearms at a passing automobile or an occupied residence (the offenses under section 246).

B. *Section 12021.1*

Finally, if any question remained whether a plain reading of the statute bars a judicial repeal of the permanent firearm ban under subdivision (a), it is dispelled by the fact that the majority's interpretation will also affect another statute, whose plain meaning is also not honored if the majority's opinion prevails. Section 12021.1, subdivision (a) in relevant part provides as follows: "Notwithstanding subdivision (a) of Section 12021, any person who has been previously convicted of any of the offenses listed in subdivision (b) and who owns or has in his or her possession or under his or her custody or control any firearm is guilty of a felony. . . ." Subdivision (b) of section 12021.1, in turn, specifies the offenses subject to the permanent firearm ban. And subdivision (b)(27) includes section 246 as one of the offenses subject to that ban because it covers "[a]ny offense enumerated in subdivision (a), (b) or (d) of Section 12001.6"—the same subdivisions of section 12001.6 (which, in turn, refer to section 246) subject to the permanent firearm ban under section 12021.

Hence, the plain language of an affiliated statute—section 12021.1—also requires that violations of section 246 be subject to a permanent firearm ban. Indeed, section 12021.1 provides that its permanent ban be given effect notwithstanding anything to the contrary suggested in the permanent ban under section 12021: "Notwithstanding subdivision (a) of section 12021, any person who has been previously convicted of any of the offenses listed . . . and who . . . has in his or her possession . . . any firearm is guilty of a felony." Accordingly, section 12021.1 controls over subdivision (a), which, in turn, governs over subdivision (c)(1). Yet, the majority, through the misapplication of a canon of statutory construction, gets it backwards: It rules that subdivision (c)(1) governs over the two controlling sections.

As demonstrated in part II, the canons of statutory construction do not require us to disregard a plain reading of sections 12021.1 and 12021.

## II. *Canons of Statutory Construction*

"[T]he fundamental goal of statutory interpretation is to ascertain and carry out the intent of the Legislature." (*Cruz, supra,* 13 Cal.4th at p. 782.) Accordingly, canons of statutory construction are not to be used as commands but merely as "guides" to construe statutes and "will not be used to defeat legislative intent." (*Ibid.*) After all, canons are based on generalizations. They may not always apply. They are tools to assist in interpretation, not the formula that always determines it. A court must be careful lest invocation of a canon cause it to lose sight of its objective to ascertain the Legislature's intent.

In this case, the canon that the majority relies upon—that the latest expression prevails in the event of a statutory conflict—cannot apply because there is no conflict between subdivisions (a) and (c)(1) in light of the legislative directive that subdivision (a) controls. Without that conflict, the foundation of the majority's argument, including its protestations of judicial restraint, crumble. Instead, the rule against implied repeals, rooted in the courts' constitutional role, applies and requires that the statutory language be honored.

### A. *The Canon That the Latest Expression Prevails*

Claiming that there is an "irrefragable conflict" between the text of subdivision (a) and subdivision (c)(1), the majority applies the canon of statutory construction that where two laws on the same subject, passed at different times, are inconsistent with each other, the later act prevails, citing *Donlon* v. *Jewett* (1891) 88 Cal. 530 [26 P. 370].

However, *Donlon v. Jewett, supra,* 88 Cal. at page 535, requires an "irreconcilable conflict" between the two laws, and as noted in *Rash v. Lungren, supra,* 59 Cal.App.4th at page 1238, "[t]here is no conflict" between the two subdivisions. Yes, the addition of section 246 to the litany of Penal Code sections in subdivision (c)(1) cannot be given effect if effect is given to subdivision (a)'s permanent firearm ban for violations of section 246. However, there is no irreconcilable conflict because (as stated in part I) the very sentence in subdivision (c)(1) that imposes a 10-year firearm ban also gives precedence to subdivision (a) in the event of a conflict.

As far back as the Federalist Papers, Alexander Hamilton observed that the rule that the latest expression prevails was one of necessity in keeping with the courts' judicial role: "This exercise of judicial discretion in determining between two contradictory laws is exemplified in a familiar instance. . . . So far as they can, by any fair construction, be reconciled to each other, reason and law conspire to dictate that this should be done; where this is impracticable, it becomes *a matter of necessity* to give effect to one in exclusion of the other." (Hamilton, The Federalist Papers, No. 78, *supra,* at p. 468, italics added.) He went on to observe that courts should not "on the pretense of a repugnancy . . . substitute their own pleasure to the constitutional intentions of the legislature . . . if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body." (*Id.* at pp. 468-469, original emphasis.)

Accordingly, it has long been held that the canon that the latest expression prevails "is a rule of necessity and ought not to be given application unless and until it shall be made to clearly appear that such irreconcilable conflict between the earlier and the later provisions of the law exists." (*Estate of Steehler, supra,* 195 Cal. at p. 399.) The term, "irreconcilable conflict" continually reappears as the prerequisite for invoking the rule. (E.g., *Donlon v. Jewett, supra,* 88 Cal. 530, 535; *Woodard v. Southern Cal. Permanente Medical Group, supra,* 171 Cal.App.3d 656, 664; 2B Sutherland, Statutory Construction, *supra,* § 51.02, p. 122 ["If there is an irreconcilable conflict between the new provision and the prior statutes, the new provision will control . . . ."].) And for good reason. Where there is no "irreconcilable" conflict, a court's construction of a statute to nullify another legislative act trespasses on the Legislature's province; where there is an "irreconcilable" conflict, the court has no choice but to choose between two conflicting provisions, and without any direction from the Legislature as to which provision to choose, the only way that a court can remain faithful to its role as interpreter, not author, of the law is to give effect to the Legislature's

"later expression" of the law. (2B Sutherland, Statutory Construction, *supra*, § 51.02, at p. 122.)

Here, it cannot be said that an "irreconcilable" conflict exists between the earlier and later enacted sections because a legislative directive specifies which one takes precedence in the event of a conflict.

Instead, the majority's analysis would have been more suitable had there been no phrase, "[e]xcept as provided in subdivision (a)," in the statute. In that case, there would be an irreconcilable conflict between the two subdivisions. Called upon to choose between two conflicting provisions for which the Legislature had provided no guidance, it would be a matter of necessity to choose one provision over the other, and the court could properly apply the rule that the most recent expression of the Legislature controls. The majority's intrusion on the legislative role is highlighted by the fact that its decision to give effect to subdivision (c)(1) at the expense of subdivision (a) is not contingent on the Legislature's resolution of the conflict.

Not surprisingly, the cases cited by appellant and the majority in support of their invocation of the canon that the later enactment prevails are cases in which an irreconcilable conflict existed, not where the Legislature avoided the conflict by directing that one statutory provision take precedence over the other. Consider *Donlon v. Jewett, supra*, 88 Cal. 530, upon which the majority decision relies. In that case, a legislative act had divided counties into 48 classes according to their population; however, an amendment modified the 39th class to cover counties with populations between 5,640 and 6,000 and then created a 39-1/2 class for counties having populations between 5,000 and 5,640. Since the amendment did not repeal the 40th and 41st classes—which also covered counties with populations between 5,000 and 5,600, the creation of a 39-1/2 class, with a population between 5,000 to 5,640, created an irreconcilable conflict. The Supreme Court acknowledged that the conflict existed: "The effect of this legislation was to produce a conflict in the terms of the statute . . . ." (*Donlon v. Jewett, supra*, 88 Cal. at pp. 532-533.) Interestingly, despite the irreconcilable conflict in *Donlon* and in keeping with the court's more recent observation that canons are guides, not commands (*Cruz, supra*, 13 Cal.4th 764), the Supreme Court did not simply negate the earlier enactments, but instead looked to the Legislature's intent and determined that the Legislature simply used the wrong number in defining the new 39-1/2 class, using the number 5,000 instead of the number 5,600. The Court concluded: "This view affords a simpler and more probable explanation of the discrepancies in the statute than any other . . . ." (88 Cal. at p. 536.)

Likewise, an actual conflict existed in the other principal cases cited by appellant. (E.g., *People* v. *Bustamante* (1997) 57 Cal.App.4th 693 [67 Cal.Rptr.2d 295] [conflict between section 113 (which made it a *misdemeanor* to manufacture or sell false government documents to conceal citizenship or resident alien status) and a second section 113, enacted as part of Proposition 187 (which made it a *felony* to manufacture, distribute or sell false documents to conceal citizenship or resident alien status)]; *People* v. *Haydon* (1951) 106 Cal.App.2d 105 [234 P.2d 720] [conflict between section 72 (which made it a *felony* for a person, with intent to defraud, to present for payment any false or fraudulent claim to any state board) and section 101 of the Unemployment Insurance Act (which made it a *misdemeanor* to willfully make a false statement to obtain or defeat any benefit or payment under the provisions of the act)].)

In contrast to these cases, there is no "irreconcilable conflict" that requires the court to choose one enactment over the other here: The Legislature has specified that the permanent firearm ban takes precedence in the event of a conflict. For the majority to choose one enactment over the other in the face of that legislative directive is to trespass on the Legislature's province. (See Hamilton, The Federalist Papers, No. 78, *supra,* at pp. 468-469.)

B. *The Canon Concerning Surplusage*

Rather than a conflict between an earlier and later enactment, this case is really one involving surplusage. If section 12021 is interpreted pursuant to its plain language, the permanent firearm ban under subdivision (a) must be given effect—and the addition of section 246 to subdivision (c)(1) becomes surplusage.[5]

The rule concerning surplusage, however, does not require that section 246 be given effect under subdivision (c)(1). The rule simply provides that all words in an act should be given effect "if possible." As stated by the California Supreme Court in *Cruz, supra,* 13 Cal.4th at page 782: "We have said that in interpreting a statute, ' " '[i]f possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose.' " ' [Citation.] Rules such as those directing courts to avoid interpreting legislative enactments as surplusage are mere guides and will not be used to defeat legislative intent. [Citations.]" (Italics added; see also *Church of Scientology of Cal.* v. *I.R.S.* (D.C. Cir. 1986) 792 F.2d 153,

---

[5]Although "surplusage" is a matter that is unnecessary to the meaning of an instrument (Black's Law Dict. (6th ed. 1990) p. 1443), the majority disputes whether the reference to section 246 in subdivision (c)(1) should be characterized as surplusage where subdivision (a) is given effect. It suggests no substitute, and its label makes no difference to this analysis.

163 [253 App.D.C. 85] [in an opinion by Justice Scalia, the court chose a statutory interpretation that resulted in some "superfluity" over "the textual and policy absurdities" that flowed from an alternative interpretation], affd. (1987) 484 U.S. 9 [108 S.Ct. 271, 98 L.Ed.2d 228].)

Hence, significance need be given to every word in a statute only where "possible." Since giving effect to the addition of section 246 in subdivision (c)(1) requires that the phrase "[e]xcept as provided in subdivision (a)" *not* be given effect *and* would require judicial repeal of the permanent firearm ban for violations of section 246 under subdivision (a) *and* section 12021.1, it should be clear that giving effect to section 246 in subdivision (c)(1) is not "possible." Hence, the rule that every word of an act be given effect cannot be invoked to give effect to section 246 in subdivision (c)(1) since there is *no* interpretation that can do so.

Finally, the Legislature itself has made clear that courts are to give effect to all provisions of a statute only "if possible," but in no event to construe a statute so as to remove or add clauses. Section 1858 of the Code of Civil Procedure provides that "[i]n the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all."

Significantly, the majority takes the opposite approach: It has tried to give effect to every word in subdivision (c), including the reference to section 246, but in so doing has omitted "what has been inserted," including the clause, "[e]xcept as provided," and the permanent ban's reference to section 246 in two separate statutes.

## C. The Canon Against Repeals by Implication

The alternative construction favored by the majority and the appellant, which gives effect to the inclusion of section 246 in subdivision (c)(1), at the expense of a partial, implied repeal of the permanent firearm ban, cannot be favored because it runs afoul of another canon: the canon against repeals by implication.

The "law shuns repeals by implication . . . ." (*Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855, 868 [167 Cal.Rptr. 820, 616 P.2d 802], cert. den. (1981) 450 U.S. 918 [101 S.Ct. 1362, 67 L.Ed.2d 344].) A repeal by implication "will occur only where the two acts are so inconsistent that there is no possibility of concurrent operation, or where the later provision gives

undebatable evidence of an intent to supersede the earlier; the courts are bound to maintain the integrity of both statutes if they may stand together. [Citations.]" (*Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 54-55 [69 Cal.Rptr. 480].) " '[S]o strong is the presumption against implied repeals that when a new enactment conflicts with an existing provision, "[i]n order for the second law to repeal or supersede the first, the former must constitute a revision of the entire subject, so that the court may say that it was intended to be a substitute for the first." ' " (*Kennedy Wholesale, Inc.* v. *State Bd. of Equalization, supra,* 53 Cal.3d at p. 249, quoting *Board of Supervisors* v. *Lonergan, supra,* 27 Cal.3d at p. 868.)

This rule, no doubt, is meant to restrain judicial trespass into the Legislature's province. It authorizes the courts to negate a legislative act only in the most compelling circumstances. It is the canon that codifies Hamilton's view in Federalist No. 78 that courts should give effect to one conflicting statute to the exclusion of another only as "a matter of necessity." (Hamilton, The Federalist Papers, No. 78, *supra,* at p. 468.)

In this case, the rule against implied repeals, a rule of constitutional dimension that safeguards the separation of powers, argues against a construction that would impliedly repeal the permanent firearm ban for violations of section 246. (In contrast, a plain reading of a statute that results in surplusage does not repeal or negate the surplusage; the surplusage simply has no effect because another provision of the statute applies.)

Significantly, the majority opinion acknowledges that "[t]he 'presumption' against implied repeals enjoins us to reconcile apparent contradictions if that is reasonably possible." (Maj. opn., *ante,* at p. 1339.) Unfortunately, while recognizing the rule, the majority fails to honor the legislative directive that would allow the court to honor the presumption.

## D. *The Rule of Leniency*

Appellant argues that an implied repeal of the permanent firearm ban for violations of section 246 can be justified on the basis of the rule of leniency. This is appellant's best argument, but on close examination it cannot justify the implied repeal sought here.

Under the rule of leniency, "[w]hen language which is susceptible to two constructions is used in a penal law, the policy of this state is to construe the statute as favorably to the defendant as its language and the circumstance of its application reasonably permit. The defendant is entitled to the benefit of

every reasonable doubt as to the true interpretation of words or the construction of a statute." (*People* v. *Overstreet* (1986) 42 Cal.3d 891, 896 [231 Cal.Rptr. 213, 726 P.2d 1288] (*Overstreet*).)

Appellant argues, reasonably enough, that "since [section] 12021[, subdivision] (c)(1) is susceptible of two constructions, it should be read the more favorable way . . . ." However, any ambiguity in the statute lies in the surplusage of section 246 in subdivision (c)(1). There is no ambiguity in the phrase "[e]xcept as provided in subdivision (a)." The precedence given to the permanent firearm ban under subdivision (a) (or under section 12021.1) is not susceptible to two constructions. Neither a literal nor plain reading of the statute would suggest to the reasonable reader that the permanent ban under subdivision (a) should not be given effect in the event of a conflict between the 10-year ban and the permanent ban. The statute, after all, provides that subdivision (a) is to be given effect over subdivision (c)(1). The reader may question why section 246 was added to subdivision (c)(1), but cannot question the legislative directive that the permanent ban takes precedence. In short, the rule of leniency does not apply here because there is no ambiguity over whether the permanent firearm ban prevails over any conflicting provision under subdivision (c)(1)—the issue in this appeal.

The rule of leniency is also not properly invoked here for three additional reasons. First, the rule of leniency " ' "is not an inexorable command to override common sense and evident statutory purpose. It does not require magnified emphasis upon a single ambiguous word in order to give it a meaning contradictory to the fair import of the whole remaining language." ' [Citations.]" (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1146 [240 Cal.Rptr. 585, 742 P.2d 1306].) In this case, the fair import of two statutes— section 12021 and section 12021.1—is that "[n]otwithstanding" anything to the contrary (see § 12021.1, subd. (a)), the permanent firearm ban is to be given effect.

Second, the rule of leniency does not require that a penal statute always be strictly construed. Section 4 provides that "[t]he rule of the common law, that penal statutes are to be strictly construed, has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice." Thus, the rule of leniency is tempered by this qualification.

Third, invocation of the rule of leniency would not further its purpose here. The primary purpose behind the rule is to provide fair warning of what the law intends if a certain line is crossed: "Strict construction . . . prevents

judicial interpretation from changing the legal consequences of acts completed prior to the decision and thus aids in meeting the requirement that a defendant have fair warning of the consequences of his acts reflected in the constitutional prohibition against ex post facto laws." (*Overstreet, supra,* 42 Cal.3d at p. 896; see *McBoyle* v. *United States* (1931) 283 U.S. 25, 27 [51 S.Ct. 340, 341, 75 L.Ed. 816].) Strict construction also protects the individual against arbitrary discretion by officials and judges against usurpation of the legislative function "which would result from enforcement of penalties when the legislative branch did not clearly prescribe them." (*Overstreet, supra,* 42 Cal.3d at p. 896.)

No one can claim a lack of fair warning that subdivision (a) applies in the event of a conflict between the permanent and the 10-year firearm ban. Although the surplusage in subdivision (c)(1) gives rise to a question as to the purpose of the inclusion of section 246 in subdivision (c)(1), anyone reading subdivision (c)(1) to determine his or her right to possess a firearm would see that there is an exception if the offense is covered under subdivision (a). Further review would reveal the existence of a separate statute (section 12021.1), also imposing a permanent ban. Nor is there any ambiguity resulting from the fact that subdivision (a) incorporates section 246 by means of its reference to subdivision (b) of section 12001.6. Statutes that expressly incorporate specific code provisions are not unclear.

### E. Conclusion Concerning the Effect of the Canons of Statutory Construction

In sum, the canons of statutory construction are "guides" for construing a statute in conformance with the Legislature's intent. (*Cruz, supra,* 13 Cal.4th at p. 782) The Legislature's directive to give precedence to the permanent firearm ban under subdivision (a) precludes any application of the canon that the latest expression prevails or of the rule of leniency: There is no irreconcilable conflict that triggers the former rule or ambiguity that invokes the latter. Instead, the presumption against implied repeals, rooted in respect for the courts' constitutional role as the interpreter, not author, of statutes, demands that the Legislature's directive be given effect over speculation that the Legislature did not mean what it said in specifying that the permanent firearm ban be honored in the event of a conflict.

### III. The Legislative History

"To the extent that uncertainty remains in interpreting statutory language, . . . both legislative history and the 'wider historical circumstances' of the enactment may be considered. [Citation.]" (*Cruz, supra,* 13 Cal.4th at pp. 782-783.)

Finding an "irrefragable" conflict between subdivisions (a) and (c), the majority does not examine the legislative history on the grounds that it would be a useless exercise to determine whether the Legislature intended to abrogate the permanent firearm ban: "[t]he fictive mind of the Legislature cannot intend to abrogate a statutory provision of which it is unaware." (Maj. opn., *ante*, at p. 1339.) However, while one would necessarily not expect to find in the legislative history an *express* intent to *impliedly* repeal a portion of subdivision (a), the legislative history can show whether the addition of section 246 to subdivision (c)(1) was a conscious decision to limit the firearm ban for all misdemeanor violations of section 246 to 10 years—notwithstanding the legislative directive that subdivision (a) applies in the event of a conflict. Were that the case, the majority would at least be basing its opinion on some indication of legislative intent, despite the absence of an "irreconcilable" conflict justifying an implied repeal of the earlier enactment.

In this case, however, the overall context in which subdivision (c)(1) was amended to add section 246 (and other code sections) to its 10-year ban suggests that the Legislature had no intention of weakening or diluting the permanent firearm ban. Nor is there any evidence that any legislator considered any of the offenses listed under subdivision (a) (with the exception of section 417, subdivision (a)(2)) not to be worthy of a permanent ban. Instead, the legislative history suggests that the Legislature meant to *expand* the types of convictions that would trigger a prohibition on firearm possession, and that a group of code sections were dumped into subdivision (c) to achieve that goal. Moreover, based on the language of the bill, any legislators who observed the overlap between subdivisions (a) and (c)(1) with respect to violations of section 245 or 246 or otherwise, were on notice that subdivision (a) would govern in the event of a conflict. No one had to worry about any weakening of the permanent firearm ban.

The California Supreme Court has stated that " 'it is well established that reports of legislative committees and commissions are part of a statute's legislative history and may be considered when the meaning of a statute is uncertain.' " (*Cruz, supra,* 13 Cal.4th at p. 773-774, fn. 5, citing *Southern Cal. Gas Co.* v. *Public Utilities Com.* (1979) 24 Cal.3d 653, 659 [156 Cal.Rptr. 733, 596 P.2d 1149].) The rationale for considering committee reports is based on the inference " 'that those who actually voted on the proposed measure read and considered the materials presented in explanation of it and that the materials therefore provide some indication of how the measure was understood at the time by those who voted to enact it.' " (*Ibid.*) This inference, of course, is not always correct, and thus such reports must

be used cautiously. A single sentence in a report that no lawmaker had in mind when casting a vote should not be used to defeat the language of a statute. (See Scalia, A Matter of Interpretation: Federal Courts and the Law (Princeton U. Press 1997) pp. 16-18.) However, in this case, the legislative materials can be reliably used because they show the *absence* of any intent to disregard the precedence given to the permanent firearm ban, or to otherwise weaken it.

Moreover, the overall context in which a statute is enacted or amended, including the surrounding statutes, can properly shed light on the meaning of an uncertain provision in a statute. "Statutes cannot be read intelligently if the eye is closed to considerations evidenced in affiliated statutes, or in the known temper of legislative opinion." (Frankfurter, *Some Reflections on the Reading of Statutes* in 2A Sutherland, Statutory Construction (5th ed. 1992) Part V: Stat. Interpretation, pp. 375, 389.) "[W]e must gather [the Legislature's] intention from the language there used, comparing it, when any ambiguity exists, with the laws upon the same subject, and looking, if necessary, to the public history of the times in which it was passed." (*Aldridge* v. *Williams* (1845) 44 U.S. 9, 24 (3 How.) [11 L.Ed. 469, 476].)

In this case, the overall context in which section 246 was added to subdivision (c)(1) suggests, for several reasons, that the Legislature did not intend to weaken or alter the permanent firearm ban. First, the addition of numerous other Penal Code sections (including section 246) to the list of misdemeanor convictions subject to the 10-year firearm ban, as part of a 1994 amendment to section 12021, was meant to *increase* the offenses which would be subject to a prohibition on the ownership or possession of firearms, not to *weaken* or *reduce* any existing prohibitions, such as those in subdivision (a). (Stats. 1994, First Ex. Sess. 1993-1994, ch. 33 (Sen. Bill No. 36).) Second, just the year before, the Legislature narrowed the offenses that were subject to the permanent firearm ban, but left violations of subdivisions (a), (b), and (d) of section 12001.6 subject to the permanent ban. Those subdivisions refer, inter alia, to section 246. (Stats. 1993, ch. 612 (Assem. Bill No. 685).) I turn to those amendments first.

A. *The 1993 Amendments to Sections 12021 and 12021.1*

During the very same 1993-1994 legislative session that added section 246 and other code sections to subdivision (c)(1), the Legislature reaffirmed that a conviction under section 246 should result in a permanent ban on the ownership or possession of a firearm.

Prior to 1993, subdivision (a) imposed a permanent firearm ban on anyone convicted, inter alia, of "an offense enumerated in Section 12001.6." Likewise, subdivision (b) of section 12021.1 imposed a permanent firearm ban for any, inter alia, offense under section 12001.6.

In 1993, the Legislature passed Assembly Bill No. 685, which, inter alia, amended subdivision (a) and subdivision (b) of section 12021.1 to limit the violent uses of firearms under section 12001.6 subject to the permanent ban. (See Stats. 1993, ch. 612, §§ 1, 9.) Instead of all offenses under section 12001.6 qualifying for the permanent ban, "subdivision (a), (b), or (d) of" was inserted into the reference to section 12001.6 in subdivision (a) of section 12021 and in subdivision (b) of section 12021.1. (See Stats. 1993, ch. 612, §§ 1, 3 (Assem. Bill No. 685).) Since section 12001.6, subdivision (b) refers to section 246, the permanent ban continued to apply to violations of section 246.

According to one bill analysis of Assembly Bill No. 685, sponsors of the measure suggested that drawing or exhibiting a firearm in a rude or threatening manner under section 417, subdivision (a)(2) (to which reference is made under section 12001.6, subd. (c)) should not merit a lifetime firearm ban. They therefore proposed that amendments be drafted to reduce such violations to a 10-year ban. (See Sen. Analysis of Assem. Bill No. 685 (1993-1994 Reg. Sess.) as amended May 19, 1993.) Accordingly, Assembly Bill No. 685, as amended in the Senate on August 17, 1993, amended subdivision (a) to limit the provisions of section 12001.6 that result in a permanent ban to subdivision (a), (b) or (d). The September 2, 1993, Senate amendment to Assembly Bill No. 685 made the same change to what is now subdivision (b)(27) of section 12021.1.[6] On or around September 30, 1993, the Governor signed Assembly Bill No. 685. The changes clearly reflected a legislative intent to limit the permanent firearm ban for offenses involving the violent use of a firearm to those under subdivisions (a), (b) or (d) of section 12001.6. This continued to include section 246. (Section 12001.6, subd. (b).)

B. *The 1994 Amendments to Section 12021*

In contrast, the 1994 amendment to, subdivision (c)(1) did not reflect any conscious intent to limit the permanent firearm ban for any of the offenses enumerated under section 12001.6, subdivision (a), (b) or (d), whose subjection to the permanent ban had just been reaffirmed the previous year.

---

[6]The amendment also compensated for the removal of section 417, subdivision (a)(2) from the convictions subject to the permanent ban by providing that the permanent ban would apply where a person had *two or more* convictions for violating subdivision (a)(2) of section 417. (See section 12021, subd. (a)(2).)

Senate Bill No. 36 was introduced by Senator Presley on February 24, 1994. As reflected in the Legislative Counsel's Digest, the purpose of the bill was primarily to *enhance* punishments for various offenses involving the possession of a firearm. Originally, the bill added "a conviction of any public offense involving a firearm" to the offenses that would subject a person to the 10-year firearm ban, while continuing to give precedence to the permanent ban in the event of a conflict.

The Senate Judiciary Committee bill analysis for the May 17, 1994, hearing cited as an issue: "Should any person who is convicted of a misdemeanor offense involving a firearm be prohibited from owning or possessing a firearm for 10 years after that conviction?" The analysis stated that the "author indicates that adding misdemeanor firearms violations to the misdemeanor violations which result in a prohibition on a person having a firearm for 10 years after conviction is generally good public policy . . . however, in response to concerns raised by others that some misdemeanors may not really be so bad that such a restriction should apply, the author has asked for additional information about all the firearms violations which are chargeable as misdemeanors with the intention of reviewing those violations and then possibly instead listing them by code section as appropriate."

By June of 1994, the general language imposing the 10-year ban on all public offenses involving a firearm had been deleted, and additional specified offenses involving a firearm were added. Specifically, the amendment in the Senate on June 22, 1994, added section 246, along with section 148, subdivision (d), and sections 186.28, 417.6, 12023, among others, to the 10-year ban. An August 10, 1994, amendment then added further code sections that would qualify for the 10-year ban, while deleting several others. The bill was approved by the Governor on or around September 21, 1994.

Hence, the 1994 amendment was intended to add new offenses to the 10-year ban, not to weaken the permanent firearm ban. In conformity with that understanding, the August 16, 1994, Assembly Committee on Public Safety analysis reported that the "bill places the following *new* offenses under the 10-year prohibition . . . ." (Italics added.)

While every legislator (or even the majority) may not have been aware of this legislative process, one thing is clear in ascertaining legislative intent: No one could reasonably have intended to weaken the permanent firearm ban under subdivision (a)—despite the addition of numerous code sections, including section 246, to subdivision (c)(1)—because the statutory language

embodied in the bill gave precedence to the permanent ban in the event of a conflict with the 10-year ban.

## IV. *Conclusion*

The majority today argues that a failure to give effect to the addition of section 246 to subdivision (c)(1)—the Legislature's most recent enactment—"encroaches on the legislative power" and that "[i]f the Legislature has made a mistake, it has the (legislative) means to correct the mistake." (Maj. opn., *ante*, at p. 1340.) But failure to give effect to the most recent enactment cannot "encroach[] on the legislative power" when the Legislature itself has directed that the most recent enactment not be given effect in the event of a conflict with the permanent ban.

Indeed, it is a wee bit bold for the majority to drape itself in the banner of judicial restraint when its decision: ignores the express statutory language directing that the permanent firearm ban be honored in the event of a conflict; effectuates a judicial repeal of the permanent ban for violations of section 246 specified by two separate statutes; runs afoul of the presumption against implied repeals, a rule rooted in constitutional considerations meant to avoid judicial legislating; ignores the legislative history in 1993, which suggests an intention to maintain a permanent ban for violations of section 246; and dismisses as irrelevant the legislative history in 1994, which shows no intent to weaken the permanent firearm ban, but instead an intent to add new offenses to which a firearm ban would apply.

In contrast, construing section 12021 to maintain the permanent ban for violations of section 246 comports with a plain reading of the statute; honors the statutory provision that the permanent ban be given precedence over the 10-year ban; does not require the court to repeal the permanent ban for violations of section 246 mandated by 2 separate statutes; and is consistent with the legislative history.

While the latter interpretation does leave section 246 in subdivision (c)(1) as surplusage, the rule of construction against surplusage only requires that surplusage be avoided "if possible." Here, it is not possible. An interpretation that results in surplusage does less violence to the statutory scheme than the alternative. If it be error to honor the Legislature's directive that subdivision (a) be given precedence over subdivision (c)(1), it should be left to the Legislature to correct the error, rather than to the court.

Nearly 90 years ago, writing to Theodore Roosevelt, Judge Learned Hand lamented that " 'we [judges] have got ourselves into the mess we are now in

. . . by failing to remember how strictly our duties should be interpretive.' " (Gunther, Learned Hand: The Man and the Judge (1994) at p. 215.) Judge Hand's observation reminds us that our legitimacy as an institution demands that we be ever faithful to the constraints of our judicial role. Faced with two alternative constructions of a statute—one which speculates that a later enactment impliedly repeals older legislative provisions in the face of a legislative directive to the contrary, and the other which construes the statute as it plainly reads, but leaves surplusage—our constitutional role leaves us no choice but to choose the latter. Accordingly, I would affirm the judgment.