[L.A. No. 31244. Aug. 14, 1980.]

BOARD OF SUPERVISORS OF SAN DIEGO COUNTY,
Plaintiff and Respondent, v.
GERALD J. LONERGAN, as Auditor and Controller, etc.,
Defendant and Appellant.

856

COUNSEL

Donald L. Clark, County Counsel, Lloyd M. Harmon, Jr., Chief Deputy County Counsel, and Jack Limber, Deputy County Counsel, for Defendant and Appellant.

George P. Kading, County Counsel, and Robert D. Curiel, Chief Assistant County Counsel, as Amici Curiae on behalf of Defendant and Appellant.

Gray, Cary, Ames & Frye, Peter G. Aylward, William S. Boggs, Paul J. Dostart, Mark L. Mann, K. Michael Garrett and Aylward & Kintz for Plaintiff and Respondent.

O'Melveny & Myers, Bennett W. Priest, Frederick A. Richman, Glen L. Kulik, Evans, Manpearl & Harter, Gerald T. Manpearl and Kent Ten Brink as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

MOSK, J.—In *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281] (hereinafter *Amador*), we upheld the validity of article XIII A of the California Constitution against multiple constitutional challenges. Adopted in June 1978 as an initiative measure designated and popularly known as Proposition 13, article XIII A significantly altered the system of real property taxation in this state.

In considering the substantial attacks mounted against the measure, we restricted our inquiry to the "principal, fundamental challenges to the validity of article XIII A as a whole." (*Id.* at p. 219.) Thus we expressly acknowledged the enactment was not wholly free from uncertainties, but reserved judgment as to their proper resolution: "'Analysis

of the problems which may arise respecting the interpretation or application of particular provisions of the act should be deferred for future cases in which those provisions are more directly challenged.' [Citation.]" (*Ibid.*) ■ We have before us such a case, and the question presented is whether the real property tax rate and valuation limitations mandated by article XIII A are applicable to property taxed on the unsecured portion of the assessment roll for the tax year 1978-1979.

Shortly after Proposition 13 was adopted, the Board of Supervisors of San Diego County (board) filed this action seeking a writ of mandate and declaratory and injunctive relief against Gerald J. Lonergan, the San Diego County Auditor and Controller (auditor), and James E. Jones, the San Diego County Treasurer-Tax Collector (tax collector). Alleging that a genuine controversy existed as to whether taxes assessed on the unsecured roll are within the coverage of article XIII A, the board sought to compel the auditor and tax collector to compute, bill, and collect taxes in accordance with the limitations set forth in the new constitutional provision. The court issued declaratory relief and held that the auditor and tax collector were required to comply with article XIII A in taxing property on the unsecured roll.[1] The auditor appeals. As will appear, we conclude that Proposition 13, when adopted, was not intended to apply to the 1978-1979 unsecured roll. Accordingly, the judgment granting declaratory relief is reversed.

## I

No factual issues are in dispute, as the question before us is essentially a matter of constitutional construction. We begin our analysis with a review of the fundamental concepts of California property tax law.

## A

Unless otherwise provided by the state Constitution or federal law, all property in California is taxable "in proportion to its full value." (Cal. Const., art. XIII, § 1; Rev. & Tax. Code, § 201.)[2] "Property" is defined comprehensively to include "all matters and things, real, personal, and mixed, capable of private ownership." (§ 103.) Real property, or real estate, is in turn defined to include: "(a) The possession of, claim to,

[1] In light of this declaration, the court deemed it unnecessary to resolve the dispute as to whether it had jurisdiction to issue a writ of mandate or injunctive relief. The judgment granting declaratory relief therefore denied the petition for writ of mandate and request for injunctive relief.

[2] Unless otherwise indicated, all constitutional references are to the California Constitution and all statutory references are to the Revenue and Taxation Code.

ownership of, or right to the possession of land. [¶] (b) All mines, minerals, and quarries in the land, all standing timber whether or not belonging to the owner of the land, and all rights and privileges appertaining thereto. [¶] (c) Improvements." (§ 104.) Personal property comprises the residue, i.e., all other property. (§ 106.)

Exemptions from taxation for real property are provided in article XIII. Additionally, the Legislature is empowered to exempt personal property by a vote of two-thirds of the membership of each house (art. XIII, § 2), and has done so in sections 202-233 of the Revenue and Taxation Code. The Legislature may classify personal property for differential taxation, but "the tax per dollar of full value shall not be higher on personal property than on real property in the same taxing jurisdiction." (Art. XIII, § 2.)

The assessor of each county has a duty to prepare an assessment roll listing all taxable property within the county. (§ 601.) For this purpose all property is classified as either secured or unsecured: "The 'secured roll' is that part of the roll containing State assessed property and property the taxes on which are a lien on real property sufficient, in the opinion of the assessor, to secure payment of the taxes. The remainder of the roll is the 'unsecured roll.'" (§ 109; see § 134.)

Whether a tax on property is a lien against real property is determined by statute. Section 2187 provides that "Every tax on real property is a lien against the property assessed." Further, a tax on personal property may be secured or "cross secured" by real property.[3] If either of these conditions exists, the personal property so secured will be assessed on the secured roll. All other personal property is assessed on the unsecured roll.

Although it is commonly assumed that "property on the unsecured roll consists almost exclusively of personal property" (*McDougall* v.

---

[3] A tax on personal property is a lien against real property if the personal property belongs to the owner of the real property on which it is located and the fact of the lien is noted on the secured roll opposite the description of the real property. (§ 2189.) Similarly, personal property that does not belong to the owner of the real property on which it is located is a lien against other real property owned by the taxpayer and located in the same county, if the taxpayer obtains a certificate from the assessor and records it with the county recorder. (§ 2189.3) The latter personal property is deemed to be "cross secured."

*County of Marin* (1962) 208 Cal.App.2d 65, 71 [25 Cal.Rptr. 107]), possessory interests in land generally are assessed on the unsecured roll. Possessory interests are defined to include: "(a) Possession of, claim to, or right to the possession of land or improvements, except when coupled with ownership of the land or improvements in the same person. [¶] (b) Taxable improvements on tax-exempt land." (§ 107.) As such, they fall within the definition of real property under section 104. Prior to the passage of Proposition 13, however, section 107 provided that possessory interests, with the exception of leasehold estates for the production of gas, petroleum, and other hydrocarbon substances, were deemed insufficient security for the payment of taxes and were assessed on the unsecured roll. (Stats. 1972, ch. 1308, § 1, p. 2608.)[4]

As a practical matter, possessory interests are separately taxed only when the underlying land is tax exempt: "In practice, assessors usually enter the entire value of land and improvements on the tax roll without distinction between possessory and reversionary interest.... [Citation.] As between reversioners and possessors payment of the tax is a private arrangement. [Citations.] When, however, the possessory interest is taxable and the reversion is exempt, only the possessory interest is subject to assessment and taxation. [Citations.]" (*De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 563 [290 P.2d 544].)[5]

---

[4]An exception was provided for Los Angeles County, in which the board of supervisors was authorized to place possessory interests on the secured roll. In August 1978, this discretionary authority was extended to certain other counties for the fiscal year 1978-1979 only. (Stats. 1978, ch. 576, § 4.7, p. 1955.) Section 107 presently provides: "All possessory interests may, in the discretion of the county board of supervisors, be considered as sufficient security for the payment of any taxes levied thereon and may be placed on the secured roll." (Stats. 1979, ch. 4, § 1.)

[5]"Since almost half of the land area of California is in the [tax-exempt] public domain, possessory interests in such land constitute a significant revenue source." (Ehrman & Flavin, Taxing Cal. Property (2d ed. 1979) § 3.6, p. 94.)

Examples of taxable possessory interests are set forth in the rules of the State Board of Equalization. (Cal. Admin. Code, tit. 18, § 28.) A more comprehensive listing includes: "1. Forest Service permits, residential and commercial, including ski lifts, resorts, stores and cabins. [¶] 2. Harbor leases, residential, commercial, and industrial. [¶] 3. Downtown auto parking leases. [¶] 4. Possession and use of residences owned by public agencies. [¶] 5. Employee housing on tax-exempt land. [¶] 6. Airport permits, including parking and garage leases. [¶] 7. Grazing land permits. [¶] 8. Indian land leases. [¶] 9. The right to cut and remove standing timber on public lands. [¶] 10. Gas, petroleum, or other hydrocarbon rights in public lands. [¶] 11. Unpatented mining claims. [¶] 12. The possession of public property at harbors, factories, airports, golf courses, marinas, recreation areas, parks, stadiums, and government facilities. [¶] 13. Possession and use of government-owned fixed equipment. [¶] 14. Air rights over public lands or freeways." (Ehrman & Flavin, *op. cit. supra*, at § 3.8, p. 101, citing Assessors' Handbook AH 517.)

In short, although the property tax system distinguishes between real and personal property, and also between secured and unsecured property, the two classification systems overlap. As a result, the secured and unsecured rolls each contain both real and personal property.

Taxes on property assessed on the secured roll are payable in two equal installments, due November 1 and February 1 of each year. (§§ 2605, 2606, 2701, 2702.)[6] The first installment becomes delinquent on December 10 and the second installment on April 10. (§§ 2617, 2618, 2704, 2705.) Taxes on the unsecured roll, however, are due March 1 preceding the fiscal year for which the taxes are levied (§§ 2901, 2192) and, if included on the assessment roll as of July 31, become delinquent on August 31 (§ 2922).

In addition to the differences in due dates and delinquency dates, one of the fundamental distinctions between secured and unsecured taxes lies in the fixing of the tax rate. The tax rate for the secured roll is established by the board of supervisors of each county on or before September 1 of each year. (Gov. Code, § 29100.) Taxes on unsecured property, however, are levied at the rate fixed for the secured roll in the prior tax year, pursuant to article XIII, section 12: "(a) Except as provided in subdivision (b), taxes on personal property, possessory interests in land, and taxable improvements located on land exempt from taxation which are not a lien upon land sufficient in value to secure their payment *shall be levied at the rates for the preceding tax year upon property of the same kind where the taxes were a lien upon land sufficient in value to secure their payment.* [¶] (b) In any year in which the assessment ratio is changed, the Legislature shall adjust the rate described in subdivision (a) to maintain equality between property on the secured and unsecured rolls." (Italics added.)[7]

B

Against this setting, Proposition 13 was adopted by the voters on June 6, 1978. As we observed in *Amador*, the initiative measure "changes the previous system of real property taxation and tax proce-

---

[6]An alternative procedure for collection of property taxes on the secured roll in four equal installments is provided for Los Angeles County. (§ 2750 et seq.)

[7]Section 2905 implements the mandate of article XIII, section 12: "In collecting taxes on unsecured property the tax rate to be used is the rate for property of the same kind on the secured roll last fixed before the lien date for the taxes to be collected. . . ."

dure by imposing important limitations upon the assessment and taxing powers of state and local governments." (22 Cal.3d at p. 218.) Two of the proposition's four principal elements are pertinent here.

Section 1, subdivision (a), of article XIII A imposes a limitation on the tax rate applicable to real property: "The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property...."[8]

Section 2, subdivision (a), imposes a limitation on the assessed value of real property, commonly referred to as the valuation "rollback" provision: "The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment...."

The tax rate and valuation limitations took effect for the tax year beginning July 1, 1978, pursuant to section 5 of article XIII A and the implementing legislation subsequently adopted. (See Stats. 1978, chs. 292, 332, 353, 576; also see Stats. 1979, ch. 242.) The issue now before us is whether these limitations apply to both real and personal property on the unsecured roll for the tax year 1978-1979. The controversy is rooted in the previously discussed and apparently conflicting requirements that the tax on personal property shall not be higher than that on real property (art. XIII, § 2) and that the unsecured roll be taxed at the prior year's secured rate (art. XIII, § 12).

In this appeal, the auditor contends that article XIII, section 12, was not repealed by the adoption of article XIII A; hence the 1978-1979 unsecured roll must be taxed at the previous year's secured rate, and the 1 percent limitation cannot be applied to the unsecured roll until the 1979-1980 tax year. In rebuttal, the board offers the following syllogism: article XIII A establishes a rate limitation for real property for the 1978-1979 tax year; the unsecured roll contains real property; therefore the rate limitation applies to real property on the 1978-1979 unsecured roll. Further, the tax on personal property cannot exceed the tax on real property; therefore the rate limitation also applies to person-

---

[8]The 1 percent limitation is not applicable to ad valorem taxes or special assessments necessary to pay any indebtedness previously approved by the voters. (Art. XIII A, § 1, subd. (b).)

al property on the unsecured roll. As we shall explain, however, the board's reasoning is fundamentally flawed.

## II

Relying on time-honored principles of constitutional construction, both parties urge us to harmonize the provisions of article XIII, section 12, and article XIII A, section 1. In the alternative, they concur that if such harmonization is not possible, one provision must prevail over the other. Not surprisingly, however, they part company at this point: the auditor contends that article XIII, section 12, must prevail, whereas the board makes a similar argument in favor of article XIII A, section 1.

Before attempting to reconcile the two provisions, we must first determine whether they indeed clash with one another. Any apparent conflict rests on the assumption that the tax rate limitation established by article XIII A must be applied to the 1978-1979 unsecured tax roll.

We turn, then, to the language of the enactment, keeping in mind the familiar and basic tenet that constitutional provisions adopted by the people are to be interpreted so as to effectuate the voters' intent. (*Kaiser* v. *Hopkins* (1936) 6 Cal.2d 537, 538 [58 P.2d 1278].) By its terms, article XIII A applies only to real property taxes. In *Amador* we upheld the constitutionality of the enactment and accorded it the liberal construction to which initiative measures are entitled. (22 Cal.3d at pp. 219, 248.) In so doing, throughout our opinion and in varying contexts we observed that the measure pertained to the subject of *real property* taxation and declared its underlying purpose and chief aim to be *real property* tax relief. (*Id.* at pp. 218, 220, 224, 230, 231, 243.)

As to the distinction entrenched in the property taxation system between secured and unsecured taxes, article XIII A is silent. The board contends it must be construed to apply to all real property, whether taxed on the secured or the unsecured roll; and since resolution of this issue is nowhere to be found in the express language of the measure, the board urges us to resort to extrinsic aids. Conceding as it must that none of them is conclusive, it nevertheless insists that when taken as a whole such aids indicate that the tax rate limitation of Proposition 13 was intended to, and therefore should, apply to the 1978-1979 unsecured roll.

First, the board refers us to the analysis by the Legislative Analyst contained in the ballot pamphlet in which the measure was submitted to the voters. (Ballot Pamp., Analysis by Legislative Analyst of Prop. 13 as presented to the voters, Gen. Elec. (June 6, 1978).) In an overview of property taxation in California, the analysis states: "The total local property tax roll consists of county assessments on real property (land and buildings) and personal property (inventories). . . ." It then provides: "In several instances the exact meaning of language used in this measure is not clear. Where this occurs we have based our analysis on an opinion of the Legislative Counsel regarding the probable court interpretation of such language. . . . [¶] Beginning with the 1978-79 fiscal year, this measure would limit the amount of property taxes that could be collected from an owner of county assessed *real* property to 1 percent of the property's full cash value. This measure does not mention county assessed personal property (such as business inventories). . . but the Legislative Counsel advises us that the 1 percent limit would apply to *all* types of taxable property." (Italics in original.) (*Id.* at p. 56.)

The board would have us read this language as proof that the voters must have understood that, if enacted, Proposition 13 would result in a tax rate limitation applicable to both the unsecured and the secured rolls for the 1978-1979 tax year. We do not agree. The quoted analysis gives overbroad and inaccurate definitions of real and personal property. Chief among its deficiencies is the absence of any mention of taxable possessory interests. Moreover, it wholly fails to apprise the voters of the concept of secured versus unsecured taxes. Proposition 13 was widely publicized as a taxpayers' revolt providing tax relief for homeowners.[9] Accordingly, we deem it probable that those electors who were previously unaware of the existence of the unsecured tax roll were in no way enlightened by the ballot pamphlet, and therefore cast their votes without regard to any anticipated effect on unsecured taxes.

As to those voters who were knowledgeable of unsecured property taxes, the absence of any discussion in the ballot pamphlet could well have led them to believe that such taxes were not embraced by Proposition 13. A factor potentially contributing to such an impression is the Legislative Analyst's incorrect definition of real property as "land and buildings," to the apparent exclusion of possessory interests. It is equal-

[9]See, e.g., Ehrman and Flavin, *op. cit. supra*, at section 2.1, page 28: "But the single most inflammatory factor [presaging the adoption of Proposition 13], the one that fanned the flames, was the dramatic increase in the burden of the property tax, particularly on California homeowners."

ly plausible that voters who knew unsecured property has for decades been taxed at the prior year's secured rate believed that the 1 percent limitation would apply to the unsecured roll in the following year. For such voters the phrase in the analysis, *"Beginning* with the 1978-79 fiscal year" (italics added), might have had especial import.

There is yet another factor bearing on the issue of voters' intent. As we previously explained, unsecured taxes for the fiscal year beginning July 1 are due the preceding March 1. Hence it could not have been within the voters' contemplation in casting their ballots on June 6, 1978, that Proposition 13, if adopted, would limit taxes due fully three months earlier. The board attempts to dismiss the significance of this fact by noting that March 1 is the *lien* date for both the secured and unsecured roll. (§ 2192.) In so doing, it blurs the distinction between the lien date and the due date: "The lien attaches on the first Monday of March regardless of the date the assessment is made; the later fixation of the amount of taxes by levy and assessment is but a step in the enforcement of the already established lien. [Citations.] When the amount is ascertained it relates back to the time the lien is fixed. [Citation.]" (*City of Long Beach* v. *Aistrup* (1958) 164 Cal.App.2d 41, 51-52 [330 P.2d 282].) Thus it is clear that on March 1, 1978, the taxes on the 1978-1979 unsecured roll were fixed and due, whereas the taxes on the secured roll remained to be assessed.[10]

In sum, we simply cannot find any convincing evidence of the voters' intent in the ballot pamphlet. We therefore decline to accept the board's characterization of that intent. More importantly, we are reluctant to rely on extrinsic aids to supply a provision that is wholly missing

---

[10]The auditor asserts that because unsecured taxes are due on March 1, the application of the 1 percent limitation to the 1978-1979 unsecured roll would amount to an impermissible retroactive application of article XIII A. Specifically, he contends the right to unsecured taxes vested in the taxing authorities on March 1, and to give article XIII A retrospective effect would therefore constitute a gift of public funds. (*Texas Co.* v. *County of Los Angeles* (1959) 52 Cal.2d 55, 66 [338 P.2d 440].)

The board responds that the constitutional proscription against gifts of public funds (art. XVI, § 6) applies only to the Legislature and thus cannot be violated by retroactive application of a voters' initiative measure. Moreover, it maintains the prohibition is not violated if the expenditure of public funds is for a public purpose. (*Schettler* v. *County of Santa Clara* (1977) 74 Cal.App.3d 990, 1003-1004 [141 Cal.Rptr. 731].) *Schettler* is readily distinguishable, however, as the Legislature in that situation made an express finding that public policy would be served by the expenditure of public funds. (*Id.* at p. 1004.)

In any event we need not reach the issue since we hold in favor of the auditor on the alternate ground that article XIII A was not intended to apply to the 1978-1979 unsecured roll.

from the enactment. ■ We have previously acknowledged that ballot pamphlets may constitute the only legislative history of an initiative measure adopted by the voters. (*White v. Davis* (1975) 13 Cal.3d 757, 775 & fn. 11 [120 Cal.Rptr. 94, 533 P.2d 222].) As such, they may properly be resorted to as a construction aid to determine the "probable meaning of *uncertain* language." (*Amador*, 22 Cal.3d at p. 246, italics added; see also *Carter v. Seaboard Finance Co.* (1949) 33 Cal.2d 564, 580-581 [203 P.2d 758]; *Carter v. Com. on Qualifications, etc.* (1939) 14 Cal.2d 179, 185 [93 P.2d 140].) Where language is clear and unambiguous, however, "there is no need for construction, and courts should not indulge in it." (*Solberg v. Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].)

Similarly, although contemporaneous constructions by the Legislature or by the administrative agencies responsible for implementation of a new enactment may be relied on to resolve ambiguities (*Amador*, 22 Cal.3d at p. 245), we resort to such extrinsic aids only when construction is necessary (*State Board of Education v. Levit* (1959) 52 Cal.2d 441, 462 [343 P.2d 8]; *Flood v. Riggs* (1978) 80 Cal.App.3d 138, 152 [145 Cal.Rptr. 573]). Hence the opinions by the Attorney General and the State Board of Equalization relied upon by the board carry no significant weight.[11]

■ Instead, we agree with the auditor that principles of constitutional construction favor a different conclusion, i.e., that property on the 1978-1979 unsecured tax roll is to be taxed at the 1977-1978 secured rate. It is well settled that a constitutional amendment is to be construed in harmony with the existing framework of which it forms a part, so as to avoid a conflict. (*Serrano v. Priest* (1971) 5 Cal.3d 584, 596 [96 Cal.Rptr. 601, 487 P.2d 1241].)

In this regard, article XIII, section 12, is clear and unambiguous. Originally enacted in 1924 as article XIII, section 9a, it provided that taxes levied on personal property not secured by real estate were to be based on the tax rate applied to real property in the preceding tax year.

---

[11]In this regard we take judicial notice of the State Board of Equalization's letter to county assessors, dated March 29, 1978, stating that because of uncertainty as to the status of taxes on the 1978-1979 unsecured roll the assessors might wish to consider waiting until after the June 6 election to issue the unsecured tax bills. The letter arguably demonstrates that the assessors were on notice of the potential impact on unsecured taxes if Proposition 13 became law; it has no effect on our reading of the intent of the voters in adopting the measure. Moreover, it has been represented to us that in some counties the unsecured tax bills were issued before June 6, 1978.

The provision was upheld in *Abrams* v. *San Francisco* (1941) 48 Cal. App.2d 1 [119 P.2d 197]. There a taxpayer sued to recover alleged excess taxes when pursuant to section 9a his personal property was taxed at the prior year's rate for real property, which happened to be higher than the current year's rate. The court explained that the purpose of the section was to alleviate the burden of adjusting the tax on unsecured property after it had been collected, through either a refund or a deficiency. This burden resulted from the fact that taxes on unsecured property were collected in March, well before the tax rate was fixed for the fiscal year beginning on July 1. "'But sec. 9a does away with the necessity of collecting taxes in advance on a rate to be determined in the future. . . . [T]axes on personal property unsecured by real estate shall be levied and collected, at a rate fixed, once for all, and definitely and . . . such rate should be the tax rate for the preceding tax year.'" (*Id.* at p. 5.) In response to the contention that this provision was violative of equal protection, the court observed that taxpayers of different classes may be treated differently. (*Id.* at p. 7.) It then concluded: "There can be no doubt that there is a natural, intrinsic and constitutional difference between secured and unsecured taxes. (*Rode* v. *Seibe* (1898) 119 Cal. 518, 521 [51 P. 869].)" (*Id.* at pp. 7-8.)[12]

Article XIII, section 9a, was amended in 1936 to include not only unsecured personal property but also "assessments upon possession of, claim to, or right to the possession of land and upon taxable improvements located on land exempt from taxation." In *Forster Shipbldg. Co.* v. *County of L. A.* (1960) 54 Cal.2d 450, 456 [6 Cal.Rptr. 24, 353 P.2d 736], we recognized that the 1936 amendment signified a change in the law in that "possessory interests in land are real property for purposes

---

[12]Asserting an equal protection claim in a communication presented after oral argument, the board attempts to distinguish *Abrams* by stressing the relatively small differential between the two rates for the year then in issue. As we have explained, however, the *Abrams* court rested its equal protection holding on the constitutional distinction between secured and unsecured taxes, not on the specific rates applied to the two rolls.

It is also contended that in *Abrams* the classification was upheld on the ground that it served the legitimate goal of administrative convenience, whereas here the sole purpose of disparate treatment is to tax the unsecured roll at a substantially higher rate than the secured roll. The attempted distinction mistakenly suggests we are reviewing a newly enacted classification. Our task is simply to decide the continued vitality of a system of taxation that has been in effect for more than 50 years.

Finally we note that the board, in its respondent's brief, expressly conceded the equal protection issue in light of our decision in *Amador*. There, upholding Proposition 13 against an equal protection challenge, we set forth the established principles of constitutional law that permit the states broad latitude and flexibility in enacting and enforcing tax laws. (22 Cal.3d at pp. 233-234.)

of taxation. . . . [and] were not within the purview of 'personal proper-
ty' as used in the original provision."

Thus, as it presently reads, article XIII, section 12, clearly provides
that taxes on unsecured property, both real and personal, are to be as-
sessed at the prior year's rate for the secured roll.

If the board is to prevail in its contention that the 1 percent limita-
tion applies to the 1978-1979 unsecured roll, it can only be because
article XIII A has repealed article XIII, section 12.[13] This proposition is
untenable for two reasons. As we previously concluded, nothing in arti-
cle XIII A suggests it was intended to apply to unsecured taxes in the
first year of its operation; obviously, then, it does not expressly repeal
article XIII, section 12. And the law shuns repeals by implication, par-
ticularly where, as here, "the prior act has been generally understood
and acted upon." (*Penziner* v. *West American Finance Co.* (1937) 10
Cal.2d 160, 176 [74 Cal.Rptr. 252].)

■ So strong is the presumption against implied repeals that when a
new enactment conflicts with an existing provision, "In order for the
second law to repeal or supersede the first, the former must constitute a
revision of the entire subject, so that the court may say that it was in-
tended to be a substitute for the first." (*Ibid.*) On this point too,

[13]The board contends that it in fact seeks to harmonize the two provisions. The gist
of its argument is that the tax rate provided by article XIII A has two components: the
flat 1 percent limitation under section 1, subdivision (a); and an amount necessary to
make annual debt service payments on general obligation bonds or other indebtedness
pursuant.to section 1, subdivision (b) (and see § 2237, subd. (a)). Since the latter
amount will fluctuate from year to year, article XIII, section 12, can apply to this com-
ponent of the tax rate under the new law.

As the auditor asserts, however, there is no authority, either statutory or constitu-
tional, for the suggested bifurcation of the tax rate to be applied to the unsecured roll.
Newly enacted section 2237.5 provides no assistance, although the board views it as
dispositive. The statute reads: "For the 1979-80 fiscal year and thereafter, except as
provided by subdivision (b) of Section 12 of Article XIII of the Constitution, for pur-
poses of computing tax rates on the unsecured tax roll, the county auditor may add to
the 1 percent rate and rate levied on the prior year's secured tax roll for indebtedness
approved by the voters prior to July 1, 1978, as described in subdivision (b) of Section
1 of Article XIII A of the California Constitution." (Stats. 1980, ch. 60, § 1.) By its
terms the statute has no application to the 1978-1979 fiscal year. It merely makes ex-
plicit that beginning in 1979-1980 taxes on the unsecured roll, *including the component
for debt service*, shall be computed at the prior year's secured tax rate.

In any event, since we conclude the board has not demonstrated the requisite voters'
intent that article XIII A apply to the unsecured roll, we need not dwell upon this
theory.

*Amador* is persuasive. In rejecting the contention that Proposition 13 amounted to a complete revision of rather than an amendment to the Constitution, and hence could not be accomplished by the initiative process, we deemed the measure to be a constitutional amendment rather than a revision. (22 Cal.3d at p. 229.) Thus we are bound to harmonize the two constitutional provisions: "Where a modification will suffice, a repeal will not be presumed." (*Penziner*, 10 Cal.2d at p. 176.)

For the reasons stated, article XIII A is inapplicable to property on the unsecured roll for the tax year 1978-1979.[14]

The judgment is reversed.

Tobriner, J., Clark, J., Richardson, J., Manuel, J., and Newman, J., concurred.

Bird, C. J., concurred in the judgment.

Respondent's petition for a rehearing was denied September 17, 1980.

---

[14]Although the judgment explicitly states that both the tax rate and valuation limitations are applicable to the 1978-1979 unsecured roll, all parties have focused their arguments on the applicability of the 1 percent rate limitation. As we conclude that Proposition 13 in its entirety was not intended to apply to the 1978-1979 unsecured roll, we need not address the question of the valuation limitation separately.