[Nos. G030042, G030075. Fourth Dist., Div. Three. Jan. 8, 2002.]

HUNTINGTON BEACH CITY COUNCIL et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ED BLACKFORD, Real Party in Interest.

ED BLACKFORD, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
HUNTINGTON BEACH CITY COUNCIL, Real Party in Interest.

**COUNSEL**

Gail C. Hutton, City Attorney, Scott F. Field, Assistant City Attorney, and Ronald Davis for Petitioners in No. G030042 and for Real Party in Interest in No. G030075.

No appearance for Respondent.

Manatt, Phelps & Phillips, Donald R. Brown and Scott R. Baugh for Real Party in Interest in No. G030042 and for Petitioner in No. G030075.

## OPINION

### SILLS, P. J.—

### I. INTRODUCTION

This proceeding involves writ petitions from both sides over a city ballot proposition. At the outset we stress that nothing we say in this opinion is intended to comment on the merits of the proposition. Anything that even *sounds* like we are commenting on the merits has been necessitated because the trial court struck out certain statements from a voters' pamphlet argument because they were supposedly "irrelevant," and there is no way one can analyze whether statements are relevant to a measure without some articulation of the probable nexus between the two.

### A. *The City's Petition*

The first writ petition we consider is the city's challenges to the trial court's exclusions of a group of statements held to be irrelevant to the ballot measure. The measure is a proposition aimed at increasing taxes paid by Huntington Beach's one electricity-generating plant.

The statute that governs the content of voter pamphlet arguments, Elections Code section 9295,[1] does not mention relevancy as among the limited bases on which a trial court has authority to strike a statement. Rather, the statute *only*—and that is the word used in the statute—allows a trial court to strike a statement if it is "false, misleading, or inconsistent with the requirements of this chapter" (that is, chapter 3 of the Elections Code, dealing with initiative and referendum in municipal elections), and even then there must be *clear and convincing evidence* the statement is false, misleading, or inconsistent with the requirements of the chapter.

At most, relevancy is only indirectly touched on by section 9295 in its reference to consistency with the "requirements" of chapter 3 of the Elections Code. But the requirements of chapter 3 are very liberal: Section 9282 authorizes voter pamphlet arguments, and merely states that a proposed argument must be "for or against any city measure." The implication is as

---

[1]All statutory references in this opinion are to the Elections Code.

long as a statement is "for or against" a city measure, it is relevant enough, and it is not the province of the courts to blue-pencil statements merely on the basis that they do not believe them to be persuasive or cogent.

As we show below, for a statement to be properly stricken as irrelevant, it must have absolutely *no* relationship to the city measure at issue. (See *Patterson v. Board of Supervisors* (1988) 202 Cal.App.3d 22, 32 [248 Cal.Rptr. 253].) In applying that test, courts must be extremely reticent in undertaking the essentially political task of playing copy editor with one side's wording of a voters' pamphlet argument. In the political arena, after all, one person's relevant argument is another person's nonsense. Only when there is "no relationship" to the measure (see *ibid.*) does the trial court have the authority to strike it.

Here, the statements that the trial court struck as irrelevant certainly *do* bear a relationship to the city's tax initiative. It was error for the trial court to order them stricken, and we grant the requested writ to require that those statements be put back.

### B. *Ed Blackford's Petition*

The second proceeding is Ed Blackford's challenges to a variety of orders allowing various statements in the ballot itself and in the voters' pamphlet to stand. Ed Blackford is president of AES Corporation, which owns the electricity-generating plant which is the target of Huntington Beach's tax increase measure.

Here are the highlights of what we conclude with regard to Blackford's petition: The use of the word "exemption" in the very title of the measure as it appears on the ballot itself is misleading and should be stricken. The word is a form of advocacy in what is necessarily a neutral forum.

Likewise, the description of the measure on the ballot is inaccurate when it asks the voter whether an ordinance requiring AES to pay "the same utility tax paid by all residents and businesses in Huntington Beach" should be adopted. The reference to "same utility tax" is misleading using an objective standard of verifiability, because the plant is already paying the "same" tax as everyone else. The proposed tax is one that only the AES facility *could* pay.

Moreover, the statement by the city in the voters' pamphlet that "any cost to AES will be passed on primarily to people outside of Huntington Beach and California" is objectively misleading to the extent that it implies that

most of the power generated by the plant is sold outside of California. At least *some* of the power from the AES plant *is* sold in Huntington Beach and a significant amount is sold in California. Two of the five generators at the plant are dedicated to California customers through the state's independent system operator, and one of the plant's five generators can only come on line in the midst of a power alert.

On the other hand, the city's statement in the voters' pamphlet that "A yes vote for this Measure will make AES pay their [*sic*] fair share of city costs that occur by virtue of their presence" is just political rhetoric and should not be excluded. "Fair share" is, at least in the context of taxation, an elastic and ideological idea that is not susceptible to objective verification. One person's fair share is another person's theft.

We also reject Blackford's challenge that the ballot is unfair because it contains two related measures that have the effect of taking the proceeds of the tax on AES and designating it for an infrastructure fund. Any unfairness inheres in the substance of what is put before the voters, not in the form or structure of the ballot itself.

Finally we decline to consider whether the tax measure, in combination with the two related measures, constitutes a special tax under Proposition 13, such that a two-thirds vote is required for it to pass. The question is not now ripe. The measure may not even get 50 percent of the vote in the upcoming election.[2] The requested writ will be denied as to that point, but without prejudice to bring up the issue later if the measure receives more than 50 percent of the vote but less than two-thirds.

## II. Background

No doubt, most Orange County residents and visitors to the region who have had occasion to drive along Pacific Coast Highway have seen the seven-story electricity-generating plant in Huntington Beach that lies just on the nonbeach side of highway near Newland Street. It has been there for the past 40 years, and was owned by Southern California Edison before the so-called deregulation of the electricity market in 1997. Deregulation forced Edison to sell the plant. AES bought it in 1998.

It would be safe to say that, whatever else it entailed, deregulation meant that electricity rates paid by consumers would not be figured on a simple

---

[2] We hereby grant the city's request for judicial notice of the election results of the November 2000 election, in which substantively the same measure received less than 47 percent of the vote (32,200 votes yes, 37,935 votes no).

"cost-plus" basis, that is, with price figured on the basis of the costs of production plus some preordained profit margin. Now, like other commodities where prices fluctuate, costs of production might go up and the supplier would not be automatically able to pass on the cost to the consumer if market conditions didn't permit it.

Since 1970 (that is, long before deregulation), Huntington Beach has imposed a 5 percent utilities tax on purchases of natural gas (and other utilities as well, including cable television). Basically it is a sales tax on your utility bill. The city tax, however, did not apply to purchases of natural gas by a "utility" for "the generation of electrical energy." The city has not imposed a tax on energy purchased in one form to make energy in another form.

The owners of the plant, first Edison then AES, therefore did not pay any utility sales tax on the *wholesale* natural gas they bought to generate electricity, though they did pay the utility tax on its telephones, its electricity and its water. The AES plant was like a furniture manufacturer that might not pay a sales tax on the wood it uses as raw materials to make furniture for resale, but that, if it bought a finished desk for one of its employees from a local store, would pay sales tax on that desk.

The City Council of Huntington Beach now wants to tax the wholesale natural gas purchases made by the plant owners for use in generating electricity. The theory, at least if we are to believe the city's position in this writ proceeding, was that given the simplistic cost-plus pricing that prevailed in the pre-1997 regulated market, any tax on the wholesale natural gas bought by the owners of the plant would merely be passed along to the consumer. In the wake of deregulation, however, the city council decided that a tax on the wholesale natural gas sold to the AES plant—which just happens to be the only electricity-generating plant in the city—would not necessarily be passed on to the consumer, and would generate a tidy sum (the city claims the revenue would amount to $2 million a year).

So the City Council has now scheduled, for the upcoming March 5, 2002 election, a ballot measure removing the provision in the city utility tax that states that the tax does not cover the sale of natural gas used to make electricity. The title of the measure as it appears on the ballot is: "Amendment of Utility Tax by Removing Electric Power Plant Exemption." The ballot statement beneath it is worded as follows. "Shall the ordinance requiring an electric power plant to pay the same Utility Tax as do residents and businesses of the City of Huntington Beach by amending the Huntington

Beach Municipal Code to remove Section 3.36.080(b) and make corresponding changes to Section 3.36.010(g), be adopted?"

Accompanying the measure on the ballot are two related measures. The first is entitled "Creation of Infrastructure Fund," about which wording there is no dispute and the other is an "advisory" measure. The advisory measure is worded, in pertinent part, this way: "Should the utility tax paid solely by an electric power plant be placed into an Infrastructure Fund to be used only for the maintenance, construction, and repair of infrastructure . . . ."

The city council has submitted an argument in favor of the tax measure, which we reproduce as appendix A. An argument opposing the measure was submitted by counsel for Ed Blackford (appendix B), and the city submitted a rebuttal to the argument opposing the measure (appendix C).

In late November 2001, Blackford filed a petition for a writ of mandate seeking to strike as false or misleading almost every statement in the argument in favor of, and in the rebuttal to the argument against, the measure. After a hearing in mid-December, the trial court issued an order, dated December 13, 2001, doing mostly that: Almost every statement in the city's ballot argument, and one comment in the city's rebuttal argument, was ordered excised.

The statements fell into two categories: One group of statements was judged to be "false or misleading." The balance were stricken on the basis that they were not "relevant."[3]

The city almost immediately brought this writ proceeding, which we expedited to meet an early January printer's deadline. Then, on December 20, 2001, just days after the petition was filed, the trial judge modified his order, basically allowing back in most of the statements that he had ordered stricken as false or misleading. The judge stood firm, however, on the statements stricken as irrelevant.

Here are the statements in the city's proposed ballot argument in favor of the tax that have been struck, and remain struck after December 20, as irrelevant: "The AES plant is ugly, pollutes our air, and our ocean." "The AES plant has been a blight on Huntington Beach for over 40 years." "In the last election on this measure, AES spent nearly $300,000 to defeat it." "AES refused to sign a contract for use of electricity solely in California."

---

[3]Said the judge, "Now, at the same time, it doesn't seem unreasonable to me that the material should be relevant to the issues at hand, that any statements whose only value is to raise feelings of hatred or passion should be inadmissible."

Additionally, the court also struck as irrelevant the words "unsightly AES plant" from the city's rebuttal argument, as contained in this sentence: "A vote for Measure __ will keep your taxes and fees down since Measure __ will generate over $2 million annually directly to Huntington Beach from the unsightly AES Plant, thus requiring less in fees and taxes from Huntington Beach residents for other city services." (We note that in order to retain grammatical sense, the stricken phrase should also include the words "from the" before the words "unsightly AES plant.")

The one statement that remained struck for being false and misleading is this one: "Currently, AES is the only business in Huntington Beach that does not pay this tax."

The judge's December 20 semi-about-face generated its own writ petition, this time from Blackford. Here are the statements, now challenged by Blackford, that the trial court restored on reconsideration, presumably as not being false or misleading: "By voting yes, you are voting to require AES Corporation to pay the same utility tax paid by all residents and businesses in Huntington Beach," "any cost to AES will be passed on primarily to people outside of Huntington Beach and California," and "A yes vote for this Measure will make AES pay their share of city costs that occur by virtue of their presence."

We now address the city's and Blackford's challenges to the modified order.

### III. Discussion

#### A. The City's Petition

##### 1. Basic Principles

Official voters' pamphlets are *limited* public forums provided by the government, so the government can constitutionally impose what would be an otherwise unlawful prior restraint of speech by way of precluding false or misleading statements. (See *Patterson v. Board of Supervisors, supra*, 202 Cal.App.3d at pp. 29-30; see also *San Francisco Forty-Niners v. Nishioka* (1999) 75 Cal.App.4th 637, 646-649 [89 Cal.Rptr.2d 388] [no First Amendment right to include false or misleading information in initiative petition]; cf. *Clark v. Burleigh* (1992) 4 Cal.4th 474, 488-495 [14 Cal.Rptr.2d 455, 841 P.2d 975] [judicial candidate's statement in ballot pamphlet was "nonpublic forum" in which speech could be subject to reasonable regulation].)

However, because freedom of speech *is* still implicated, any restrictions must be narrowly drawn. (*Patterson v. Board of Supervisors, supra*, 202

Cal.App.3d at p. 30.) ■ The statute at issue here, for example, expressly requires clear and convincing evidence before the trial court may interfere with a ballot argument, and the Legislature went out of its way to emphasize the narrowness of the scope of any proper challenges by appending the word "only" in front of the heightened evidentiary standard. The operative language in section 9295 is: "A peremptory writ of mandate or an injunction shall be issued *only* upon clear and convincing proof that the material in question is false, misleading, or inconsistent with the requirements of this chapter . . . ." (Italics added.)

As mentioned above, section 9295 contains no express relevancy requirement. At the outer edges, of course, as the trial judge intuited, both common sense and the reference to the general requirements of the chapter would imply some *minimal* relevancy requirement. But it is indeed a minimal requirement. As we have seen, the only statutory basis for an inferred relevancy requirement, section 9282, merely states that a proposed argument must be "for or against any city measure." Moreover, section 9282 emphasizes the breadth of what is allowed in ballot arguments by ensuring that any such argument is presented in the pamphlet as merely the "opinions of the authors," which exist in juxtaposition to the "impartial analysis," which the city attorney must prepare showing the effect of the measure on existing law. (§ 9280.)

Of course, at the extreme fringe, some statements will not pass even a minimal relevancy test. No one would doubt, of course, that with regard to a city measure to, say, extend the term limits on the city's mayor, a ballot argument submitted against the measure which dwelt on the personal shortcomings of a possible mayoral candidate, as shown by papers filed in divorce court by her soon-to-be ex-spouse, would be beyond the pale. (Those are, incidentally, pretty much the facts in *Patterson*, where arguments in opposition to a rezoning measure were a series of personal attacks on the potential developers of the property in question, lifted from divorce papers. It was idle scandal-mongering that bore "no relationship" to the measure, and was "totally unrelated" to the proposed rezoning [see *Patterson v. Board of Supervisors, supra*, 202 Cal.App.3d at p. 32].)

But as the absolutist language used by the *Patterson* court ("no relationship," "totally unrelated") reveals, the relevancy requirement is an extremely light burden to carry. Only if there is "no relationship" between the statement and the city measure does it fail. Any other test would mean that courts would be forced to determine the substantive persuasiveness of the arguments.

Indeed, the judiciary must be mindful that the rough and tumble of politics is ill-suited to the imposition of the relatively stringent judicial standards of "relevancy." Imagine a presidential debate where each side was allowed to make formal relevancy objections to statements made by the other side, with the moderator, in the style of a trial judge, required to make a quick determination on the objection. Not only would the objections drown out the substance debate, but it would soon become obvious that the moderator would become embroiled in the merits of the arguments presented by each side. (The possibilities could be comic, of course, e.g., "Ms. Candidate, that last statement about your opponent's lack of experience in foreign policy doesn't prove anything about her views on expanded free trade zones, and I am hereby ordering it stricken. The audience is hereby instructed, when they vote, to disregard it as irrelevant.")[4]

### 2. *The Statements Stricken for Irrelevance Were Indeed Relevant*

It goes without saying that taxation involves policy choices. Some oxen are gored more than others. Courts do not generally second-guess these choices, which often need not make a great deal of theoretical or economic sense. Perhaps some classes of taxpayers are hit with higher taxes simply because they aren't numerous or cuddly.

Ballot pamphlet statements "may constitute the only legislative history of an initiative measure adopted." (*Board of Supervisors v. Lonergan* (1980) 27 Cal.3d 855, 866 [167 Cal.Rptr. 820, 616 P.2d 802].) Here, the city council's ballot statements, with its references to ugliness, blight and pollution, show *precisely* why the city council wants to increase taxes on the plant. In a

---

[4]Indeed, the limits of rhetoric suggest that application of stringent judicial standards of relevancy doesn't even work when it comes to the product of judges, much less that of politicians and their consultants. Judge Posner has called Oliver Wendell Holmes's dissent in *Lochner v. New York* (1905) 198 U.S. 45 [25 S.Ct. 539, 49 L.Ed. 937] "the most famous opinion of our most famous judge" and "merely the greatest judicial opinion of the last hundred years." (Posner, Law and Literature: A Misunderstood Relation (Harv. U. Press 1988) at pp. 281, 285.) But it would not "have received a high grade in a law school examination in 1905." (*Id.* at p. 285.) "It is not logically organized, does not join issue sharply with the majority, is not scrupulous in its treatment of the majority opinion or of precedent . . . . It is not, in short, a good judicial opinion." (*Ibid.*) Indeed, at one point Holmes unfairly suggests that the majority wanted to privatize the post office (*id.* at p. 284), which is the kind of argument that, under the no-ad hominem standard used by the trial judge here, might have been stricken as "irrelevant." Yet the *Lochner* dissent remains a "rhetorical masterpiece." (*Id.* at p. 281.)

If Holmes can get away with not joining issue "sharply" in a "great" opinion, surely the authors of voter pamphlet arguments need not be held to rigorous standards of relevancy either. Authors of arguments in voter pamphlets should hardly be held to more stringent standards than Supreme Court judges.

word, the city council just plain doesn't like the fact that the plant operates within the confines of the fair City of Huntington Beach. The AES plant is, after all, a prototypical "smokestack industry" that easily offends upscale sensibilities, and one that is saddled with the burden of being *conspicuous* in its pollution. Every beachgoer in the area can see the smoke coming from the generators. The AES plant, in short, is an easy target. It isn't very cuddly, and it can't move to Nevada.

Many literate citizens have heard Justice Marshall's phrase, "the power to tax involves the power to destroy," lifted from the text of *McCulloch v. Maryland* (1819) 17 U.S. 316, 431 [4 L.Ed.2d 579, 607]. But most of us are not typically aware of the context which generated the phrase. President Madison had helped create a federal bank, the Bank of the United States, and the various states just plain didn't like the idea of such an institution in their backyards. Call it financial "nimbyism" after the acronym for "not in my backyard." (E.g., *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (2000) 79 Cal.App.4th 505, 516 [94 Cal.Rptr.2d 205] [prevailing nimbys were not automatically disqualified from attorney fee award by virtue of their nimbyism].) The present case, by the same token, may be described as goombyism, for "get out of my backyard" or at least, "if you stay here, you're going to pay for it."

It appears from the trial court's comments that it was troubled by the "ad hominem" quality of the city's statements. Ad hominem arguments, of course, constitute one of the most common errors in logic: Trying to win an argument by calling your opponent names ("Jane, you ignorant etcetera . . . .") only shows the paucity of your own reasoning. (Of course, it happens all the time in real world politics.) Since the trial judge here had probably read *Patterson* with its reference to an "ad hominem attack," it appears he concluded that the city council's arguments here wouldn't pass muster. (See *Patterson v. Board of Supervisors, supra,* 202 Cal.App.3d at p. 32.)[5]

---

[5]The trial judge was probably also (and very understandably) concerned with a systemic problem inherent in election pamphlet cases: The possibility that one side or the other will subsequently exploit a judicial decision. Thus in the hearing of December 19, counsel for the city, in referring to the court's previous (and for the most part subsequently modified) order striking a number of statements as false or misleading, voiced the fear that the other side would "spin" the ruling into "The Superior Court of the County of Orange found my clients were deceitful liars." Perhaps it was that point that prompted the trial judge to subsequently modify his previous conclusions with regard to most of the statements found false and misleading.

There is not much the judiciary can, or perhaps should, do about the problem. Judges shouldn't alter the decisionmaking process (or, in our case, the construction of the opinion we would normally write anyway) out of the fear that one side will "spin" it to its own advantage.

*Patterson*, however, is distinguishable in that regard. *Patterson* involved a rezoning ordinance, and the ad hominem comments in question there were *totally* without relationship to that measure.

But tax law is different. As we have said, it is a simple truism that legislative bodies make policy choices that are directed against different taxpayers, and sometimes, if the truth be told, the basis for the choice is nothing more than some taxpayers are easy targets. There is a genuine "ad hominem" quality to tax policy. So when politicians openly acknowledge, in a ballot argument, why they have singled out a taxpayer for higher taxes, the electorate is the better informed. What we have here, per *Board of Supervisors v. Lonergan, supra*, 27 Cal.3d 855, is a refreshingly honest legislative history of the city's proposed measure.

The following comments thus easily pass the minimal relevancy test because they reveal the essential policy choice behind the city initiative: "The AES plant is ugly, pollutes our air, and our ocean," "The AES plant has been a blight on Huntington Beach for over 40 years," and the reference to the "unsightly AES plant" in the rebuttal.

The next comment, "In the last election on this measure, AES spent nearly $300,000 to defeat it" presents a somewhat more complex problem. At one level it tries to operate as a kind of preemptive strike, basically telling the voters that they should beware of anything they might see opposing the tax, because it will probably have been funded by what the city characterizes as an ugly unsightly polluting "blighter." But at another level there is the subtext that AES has enough money lying around to mount a well-funded campaign to oppose the tax, rather than just cheerfully accepting its fate.

Given that the city measure is aimed *solely* at the AES plant (no other business would be affected), the proposed statement meets the standard of minimal relevance: First, once again, the statement reveals the depth of the city's animus toward the power plant—how dare AES spend money to oppose a tax increase. Second, the statement has rhetorical significance: It is argument by caricature. It paints, as the city no doubt hopes, AES as a stock-rich villain out of a Frank Capra movie. It evokes the kind of images that politicians have used to drum up support for tax increases from time immemorial.

That leaves the final statement stricken as irrelevant, "AES refused to sign a contract for use of electricity solely in California." *This statement, like the*

---

Sorry, that's just politics, and judges cannot control the use that might be made of their decisions.

previous one, both reveals the city's motivation and seeks to counter possible opposition. While this statement meets a minimal relevancy test (basically it is an appeal to self-interest not unlike Antony's speech at Caesar's funeral[6]), it is, however, factually misleading, as we explain in part III.B.2.a. of this opinion below.

### 3. The One Statement the Trial Court Left Stricken for Being False and Misleading Really Was Misleading

■ In his December 13 ruling, the trial judge struck this statement in the city's voter pamphlet arguments for being false and misleading: "Currently, AES is the only business in Huntington Beach that does not pay this tax." On reconsideration, he still found it false and misleading. He was right.

In determining whether statements are false or misleading, courts look to whether the challenged statement is subject to verifiability, as distinct from "typical hyperbole and opinionated comments common to political debate." (See *San Francisco Forty-Niners v. Nishioka, supra,* 75 Cal.App.4th at p. 649.) An "outright falsehood" or a statement that is "objectively untrue" may be stricken. (*Ibid.*) We need only add that context may show that a statement that, in one sense, can be said to be literally true can still be materially misleading; hence, the Legislature did not indulge in redundancy when it used both words. On the other hand, the standard, as defined by the Legislature, is necessarily a high one: Courts may intervene *only* if clear and convincing evidence shows the statement to be false or misleading.

The statement that "Currently, AES is the only business in Huntington Beach that does not pay this tax" may be literally true, but *in context* it is misleading in light of objective facts. The key words are, of course, "this tax." In context "this tax" is defined by the statement immediately above, which refers to "the same utility tax paid by all residents." On this point there is verifiable falsity. AES *does* pay "the *same* utility tax paid by all residents." (Italics added.) It gets hit with Huntington Beach's 5 percent

---

[6]Antony held up the Caesar's will before the mob and said, in essence, "if you knew all the goodies Caesar had promised you, you'd all go crazy." Here's the original: "Have patience gentle friend, I must not read it; It is not meet you know how Caesar loved you. You are not wood, you are not stones, but men; And, being men, hearing the will of Caesar, It will inflame you, it will make you mad: 'Tis good you know not that you are his heirs; For, if you should, O what will come of it!" (Shakespeare, Julius Caesar, act III, scene 2.)

The speech is one of the most studied pieces of persuasive rhetoric of all time. And if the promise of a free lunch was relevant enough for Antony, it is relevant enough for the Huntington Beach City Council. Basically, the city council is promising better city services because the people who will bear the real cost of the tax, including the consumers of AES's electricity, are elsewhere.

utility sales tax on its *utility bills* the same as everybody else. What it doesn't pay is a tax that *only it could pay.* So to say that AES is the only business that does not pay "this tax" is to mislead. It deliberately confuses the proposed tax with the existing tax.

### B. *Blackford's Petition*

#### 1. *Challenges to the Ballot Itself*

##### a. *Exemption?*

■ The wording of a ballot is governed by different standards than govern arguments in voters' pamphlets. Voter pamphlets are governed by the strictures inherent in section 9295—which the Legislature plainly intended to maximize freedom of speech short a very few specified categories, e.g., false, misleading, or inconsistent with the requirements of chapter 3.

Ballots, on the other hand, are hemmed in by the constitutional guarantees of equal protection and freedom of speech. (See *Citizens for Responsible Government v. City of Albany* (1997) 56 Cal.App.4th 1199, 1228-1229 [66 Cal.Rptr.2d 102]; see also *Stanson v. Mott* (1976) 17 Cal.3d 206, 219 [130 Cal.Rptr. 697, 551 P.2d 1] ["the First Amendment precludes the government from making public facilities available to only favored political view-points"].) These guarantees mean, in practical effect, that the wording on a ballot or the structure of the ballot cannot favor a particular partisan position. (See *Citizens for Responsible Government v. City of Albany, supra,* 56 Cal.App.4th at p. 1228.) For example, as our high court pointed out in *Gould v. Grubb* (1975) 14 Cal.3d 661, 670 [122 Cal.Rptr. 377, 536 P.2d 1337], automatically putting the incumbent's name first, in light of evidence that some voters tend to vote for the first name on the ballot just because it is the first name on the ballot, unfairly dilutes the weight of those voters who do not vote for the incumbent. The automatic reservation of the top line for incumbents thus contravened equal protection. For the same reason the *Gould* court precluded using automatic alphabetical order: Why should those with names that being with letters near the beginning of the alphabet get an advantage by virtue of the very structure of the ballot? (See *id.* at pp. 674-675.)

■ The question in this case, then, is whether the word "exemption" is insufficiently neutral to appear in the *title* of the measure on the ballot. Blackford asserts that the word "exemption" carries the whiff of privilege about it. He would substitute the word "exclusion" in its stead, as more neutral.

We agree. The word, in this context, is advocacy by other means. "Exemptions"—particularly in a tax context—connote unfair influence and special treatment. It conveys the idea that AES isn't paying *any* utility tax at all—a proposition that, as we have seen, is simply not true. To return to our hypothetical of the furniture maker: If there was a special tax on the sale of wood products, which didn't cover wholesale sales of wood to make furniture, it would be unfair to say that the furniture maker was "exempt" from the tax on the sale of finished wood products. There is a difference, after all, between wholesale raw materials and retail products made of those materials. And that is, substantively, the difference here: It is one thing for a consumer to receive energy from a utility to use to light a room, another for the utility itself to receive energy in one form (natural gas) so it can sell it to the consumer in another (electricity). To say that a wholesale consumer and *producer* is "exempt" from a tax paid by all retail consumers is not quite accurate. The tax extends to one thing; it just doesn't extend to another.

The title of the measure as it now stands reads, "Amendment of Utility Tax by Removing Electric Power Plant Exemption." Because of the extreme time constraints under which this proceeding is conducted (there is almost no time left for any further haggling over words), we will grant the writ to order the city to rewrite the title to conform with Blackford's suggestion that the word "exclusion" be substituted for "exemption." It should now read: "Amendment of Utility Tax by Removing Electric Power Plant Exclusion."

b. *The "Same" Tax?*

The description of the measure as it appears on the ballot asks the voter whether the "ordinance" that requires the power plant to "pay the same Utility Tax as do residents and businesses of the City of Huntington Beach" should be adopted.

Not only is this advocacy in the description of the measure on the ballot itself, it is substantively misleading. As we have indicated above, no business *but* AES could possibly pay a tax on wholesale natural gas used to generate electricity. Therefore what AES will pay if the measure passes is not the "same" tax at all. It is, substantively, a tax that will be unique to the AES plant because the AES plant is the only business in the city that buys energy to make energy in a different form for sale to consumers.

By the same token, the corresponding language in the ballot argument ("By voting yes, you are voting to require the AES Corporation to pay the same utility tax paid by all residents and businesses in Huntington Beach") is also misleading, and should have remained stricken.

### c. *"Paid Solely"*

The statement in the advisory measure that asks the voters whether "the utility tax paid *solely* by an electric power plant be placed into an Infrastructure Fund" (italics added) *is* not misleading. The measure *is* aimed "solely" at AES. It is the only business that could be affected by the measure.

## 2. *Challenges to Statements in the Voters' Pamphlet*

### a. *"Refusal" to Sign a Contract?*

■ As shown above, the city's voter pamphlet argument that "AES refused to sign a contract for the use of electricity solely in California" meets the standards of relevancy for voter pamphlet arguments. Arguments appealing to self-interest are always relevant.

However, the statement is factually misleading. The AES plant has five units. The so-called refusal on the part of the corporation to sign a contract with the state only applied to two of those five units—units three and four. Two of the units *are* pledged to the state's independent system operator for use in California—and therefore some of the juice certainly goes to California consumers and some of that presumably goes to Huntington Beach. (Moreover, even the part that doesn't go to Huntington Beach helps alleviate shortages and potential shortages elsewhere in the state, to the benefit of Huntington Beach residents.) The last unit, unit five, operates only when there is a staged alert due to a shortage declared by the independent system operator. By definition its energy can only be sold to California consumers.

In short, there is no controverting the fact that at least some of AES's electricity will be sold in Huntington Beach and California, even though the implication of the statement is that AES only sells its electricity to out-of-state energy companies. That is verifiably not true. The pamphlet statement affirmatively misleads the reader (indeed, it would have misled us if we didn't have the benefit of papers filed by Blackford) into believing that *none* of the electricity produced by the plant will be sold in California when some will.

### b. *Passing On "Any" Costs to Out-of-Staters?*

By the same token, the facts about the generators—three of the five could end up producing electricity sold in California, especially during a shortage—mean that the statement in the voter pamphlet that "any cost to AES will be passed on primarily to people outside of Huntington Beach and

California" is at least partially misleading. True, the word "primarily" saves the statement as regard to people in Huntington Beach—it is unlikely the residents of the city could consume enough power to be "primarily" affected by any tax increase on the plant. (And in any event we do not have "clear and convincing" evidence that the electricity produced by the plant is "primarily" consumed by Huntington Beach residents such as to make the statement verifiably false as to them.)

But the all-encompassing word "any," in combination with the more general word "primarily," certainly misleads the reader as to the effect on California residents generally. "Any" is one of those powerful, reassuring, absolutist words that creates a bright line and is easily subject to objective falsification. The fair import of the sentence as it now stands is that the bulk of "any" cost caused by the tax will be "passed on" to out-of-state residents, a statement that is inconsistent with the dedication of three of five generators to the California independent system operator.

The statement must therefore be modified to strike the words "and California" from it.

### c. *Fair Shares*

On the other hand, the statement that "A yes vote for this measure will make AES pay their fair share of city costs that occur by virtue of their presence" is not subject to objective verifiability. You can get a Ph.D. in political science studying what "fair shares" are and still not come to any firm conclusion. The subject has occupied political philosophers since at least Aristotle, who, in addressing the subject of "distributive justice," began a long tradition in political philosophy of thinking about exactly what do you mean by "fair" in "fair share." It is one of those topics that is particularly suited for the marketplace of ideas. The city's argument is thus, in section 9282 terms, mere opinion.

### 3. *Challenges to the Related Measures*

### a. *Advocacy by Linkage*

Blackford objects to the linkage of two other ballot measures to the tax increase measure. One proposes to create an infrastructure fund; the other will ostensibly advise the city that any revenue from the "utility tax paid solely by an electric power plant" should go into that infrastructure fund. Blackford's theory is that the very relatedness of the three measures is a kind of subtle partisanship in the ballot form.

The issue is a close one, because it *is* reasonably obvious that the city is trying to use the two related but apparently uncontroversial measures (who could, in theory, be against merely designating an infrastructure fund?) to influence the voters as to the third, more controversial measure, which involves a tax increase on one particular business.

*Gould v. Grubb, supra*, 14 Cal.3d 661, however, indicates that before the form or structure of a ballot is subject to constitutional infirmity it must have a "real and appreciable" impact on the equality, fairness, and integrity of the electoral process. (*Id.* at p. 670.) Here, the subtle advocacy and partisanship in the very existence of the two accompanying measures is not an aspect of the electoral "process," but is, rather, a matter of their *substance.* The fact that some measures on a ballot make other measures appear more desirable doesn't make the ballot or electoral process *itself* unfair. What Blackford is really objecting to is that the city has tried to design its tax measure to be more desirable than might otherwise be the case.

Suppose, for example, that the city tried to do the whole thing in one measure rather than three. (E.g., a single measure that said, "let's increase the taxes on the AES plant and restrict all the proceeds to just an infrastructure fund.") There would be no partisan impact beyond the very content of the measure itself. The ballot *qua* ballot would be just as neutral as ever. The three measures here are substantively equivalent.[7]

### b. *Two-thirds Required?*

Finally, Blackford suggests that the three measures, related to each other as they are, constitute a "special tax" under Proposition 13, and therefore a two-thirds vote will be necessary to pass them. The issue is not ripe now in this writ proceeding. There is no reason it cannot wait until after the election. Of course, our opinion is completely without prejudice to either party on the issue.

### IV. DISPOSITION

Rather than sort through the court's December 20, 2001 order (which itself only partially modified the court's December 13, 2001 order) paragraph by paragraph, the easiest way to handle this is to let a peremptory writ issue commanding the superior court simply to vacate its December 20, 2001

---

[7]We express absolutely no opinion as to whether the relatedness of the three measures violates any rule other than the one against partisanship in the ballot form itself. Our opinion is completely without prejudice to any substantive challenge to, or in defense of, any or all of the three measures.

order in its entirety, and enter a new and different order which does the following:

(1) Strikes *no* statements or language from the city's voters' pamphlet arguments as irrelevant.

(2) Strikes "Currently, AES is the only business in Huntington Beach that does not pay this tax" from the city's voter pamphlet argument as misleading.

(3) Strikes the word "exemption" from the title of the ballot measure as it appears on the ballot as misleading and substitutes the word "exclusion."

(4) Strikes the words "requiring an electric power plant to pay the same tax as do residents and businesses of the City of Huntington Beach by" from the description of the measure on the ballot.

(5) Strikes the sentence "By voting yes, you are voting to require the AES Corporation to pay the same utility tax paid by all residents and businesses in Huntington Beach" from the city's voters' pamphlet argument as misleading.

(6) Strikes the sentence "AES refused to sign a contract for use of electricity solely in California" from the city's voter pamphlet argument as misleading.

(7) Strikes the words "and California" as misleading from the following statement in the city's voter pamphlet argument: "any cost to AES will be passed on primarily to people outside of Huntington Beach and California."

(8) Leaves the rest of the ballot and voters' pamphlet arguments untouched.

In the interests of justice, each side will bear its costs from this proceeding.

Rylaarsdam, J., and Moore, J., concurred.

A petition for a rehearing was denied February 4, 2002.